Commonwealth *v.* Pinney, Appellant.

Submitted November 16, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*H. David Rothman,* for appellant.

*Charles W. Johns* and *Robert L. Eberhardt,* Assistant District Attorneys, *John M. Tighe,* First Assistant District Attorney, and *John J. Hickton,* District Attorney, for Commonwealth, appellee.

OPINION BY VAN DER VOORT, J., September 22, 1975:

On December 9, 1971, a Pennsylvania State Policeman was murdered and two Altoona police officers were wounded. On the morning of the following day, a bus driver phoned the Pennsylvania State Police with the information that three men who matched the description of the murderers were riding his bus bound for Monroeville from Indiana, Pennsylvania. Three police officers in plain clothes boarded the bus in Monroeville and spotted appellant and two other men sitting toward the rear of the bus. The officers had descriptions of two of the men. Observing that appellant and one of the other two matched the descriptions of the men wanted for the shootings, the police officers got behind the suspects, identified themselves as police officers, and conducted a search for weapons. A pat-down of appellant disclosed a packet which contained 21.0 grams of marijuana and 571 diamphetamine tablets. None of the three men on the bus was involved in the crimes committed in Altoona. Appellant was tried on December 14, 1972, by a judge sitting without a jury, was found guilty of possession of narcotic and dangerous drugs, and was sentenced to one year on probation and to pay costs.

Appellant raises but one argument in his appeal: that the search of appellant's person without a search

or arrest warrant violated his constitutional right to be free from unreasonable search and seizure, and that the trial judge was therefore in error in denying the application to suppress the drugs found in appellant's jacket pocket. When a person is lawfully arrested, the police have the right, without first obtaining a search warrant, to make a contemporaneous search of the person of the accused for weapons, for the fruits of the crime, or for implements used to commit the crime. This rule is necessary for the protection of the arresting officers, and also to prevent the destruction of evidence. *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed.2d 685 (1969) ; *Preston v. United States*, 376 U.S. 364, 367, 84 S. Ct. 881, 11 L. Ed.2d 777 (1964). Whether or not an arrest is constitutionally valid depends in turn upon whether, at the moment the arrest is made, the police officers have probable cause to make it—whether at the time of the arrest the facts and circumstances within the knowledge of the arresting officers and of which they have reasonably trustworthy information are sufficient to warrant a man of reasonable caution in believing that the suspect has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed.2d 142 (1964) ; *Commonwealth v. Murray*, 437 Pa. 326, 329, 263 A.2d 886 (1970) ; *Commonwealth v. Brayboy*, 431 Pa. 365, 369, 246 A.2d 675 (1968). The basic determination then that we must make in the case before us is whether the police had probable cause to arrest appellant in connection with the murder of the State Police Officer and the wounding of the two Altoona policemen. We turn to the United States Supreme Court case of *Hill v. California*, 401 U.S. 797, 91 S. Ct. 1106, 28 L. Ed.2d 484 (1971) for guidance. In *Hill*, accomplices to a robbery implicated the petitioner, Archie Hill, and gave the latter's address, along with his description, to the police. At the address given them (which was in fact the address of the suspect Hill), the police arrested a man named

Miller who was alone there who matched the description of Archie Hill. The Supreme Court said that it would not disturb the finding of the California Supreme Court that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." 401 U.S. at 802. The Court went on to say: "In these circumstances the police were entitled to do what the law would have allowed them to do if Miller had in fact been Hill, that is, to search incident to arrest and to seize evidence of the crime the police had probable cause to believe Hill had committed." 401 U.S. at 804.

In the case before us one of the arresting officers was asked at trial whether on boarding the bus he made any attempt to observe if the three men fit the description of the men who had shot the police officers, and the officer replied "Yes, and they certainly did in my opinion." The officer testified that appellant was the first person he observed upon boarding the bus, and that appellant matched the description of one of the murderers: white male, age 18 to 20, five feet ten inches tall, thin build, long blond hair. The defendant took the stand and testified that he was 19 years old at the time of the arrest, five feet seven inches tall, and had always had brown hair. (One police officer observed from the stand that appellant's hair was light brown—"Some people would call it blond . . . the front wave it could be called blond.") Considering the circumstances—the reasonable belief that appellant was one of the men wanted for the shootings, and the necessity of exercising the utmost caution in apprehending the three men—we find that the police had probable cause to arrest appellant and to conduct a search of his person. The discovery of the drugs in appellant's jacket pocket was pursuant to a valid search, and the lower court therefore properly admitted the drugs into evidence.

Judgment affirmed.

JACOBS, CERCONE, and SPAETH, JJ., concur in the result.

———

DISSENTING OPINION BY HOFFMAN, J.:

Appellant contends that his conviction for possession of narcotics and dangerous drugs should be reversed because the contraband introduced into evidence was the product of an unlawful search. The Commonwealth contends that the evidence was seized pursuant to a protective search for weapons during an investigation of an entirely unrelated crime.

On December 9, 1971, a Pennsylvania State policeman was murdered and two Altoona police officers were wounded. The descriptions and names of the two suspects were broadcast. On December 10, a bus driver noticed three men boarding his bus in Altoona, two of whom he believed matched the broadcast descriptions. He telephoned the State Police.

On instructions from State Police headquarters, two State Police officers in plain clothes joined a Monroeville police officer at the Monroeville bus depot, pretended to be passengers, and boarded the bus at approximately 11:15 a.m. All of the officers had "complete" descriptions of the two suspects. One suspect (Suspect No. 1) was described as a white male, twenty years old, five feet eight or five feet nine inches in height, slender build, one hundred fifty pounds, with long, black shaggy hair, and named Mark "Stoney" Geddis. The second suspect (Suspect No. 2) was described as a white male, five feet eleven inches in height, one hundred eighty pounds, with neat long, thin hair and sideburns dyed black or blond, and believed to be Charles Eugene "Crazy" Koons. Suspect No. 2 also had a mark on the left side of his nose.[1]

———

1. The description of the suspects given at the preliminary hearing by the two officers differed in several respects from these

The three officers proceeded immediately to the rear of the bus where appellant and his two companions were seated. When asked what descriptive criteria the officers relied on in determining which of the passengers they sought, State Police Officer Squiller testified: ". . . the fact that the teletype reported three subjects. Number two, they had long hair. Basically that was it." He denied making the determination on the basis of weight and height, but did feel that hair coloration was a key factor in his identification. Two of the officers assumed positions behind appellant and one took a position in front. At this point, the officers identified themselves as police and asked the three youths for identification. The youths all produced identification which was inconsistent with the names of the suspects; but the officers, suspicious of the possibility of false identification, felt further investigation was warranted. Squiller then conducted a pat-down for weapons. He felt a bulge in appellant's coat pocket, which he described as a hard object. He stated that he believed at the time that it might have been a small automatic weapon. Squiller then told the appellant to empty his pockets. Appellant removed from his pockets a two inch by four inch plastic bag of marijuana and six aluminum foil packets, which later investigation proved to contain 571 diamphetamine tablets. There was no testimony that the officers had their guns drawn. The appellant and his companions were removed from the bus. A subsequent check of identifications at the bus

official descriptions. Officer Michaels vacillated as to the color of hair, seemingly confused the names of the suspects even to the point of giving a third name, and seemed to mix the description of the appellant with that of the official description of the suspects. State Police Officer Milton Squiller, however, supplied the above official description by reading from a written description copied from the teletyped original. It is this official description which this Court must rely on in determining the subsequent reasonableness of the officers' conduct.

depot cleared the three youths of any connection with the police murder.

On December 14, 1972, appellant waived his right to jury trial, and motions to suppress were heard in a proceeding consolidated with this trial. Officer Michaels testified that he immediately identified appellant as Suspect No. 1 and carefully described a "Charles 'Crazy' Knisely" as a white male, eighteen to twenty years of age, five foot ten, thin build, with long blond hair. When pressed on cross-examination, he conceded that Suspect No. 1 and appellant had different hair coloration. He explained this discrepancy by saying that the bus was dark.[2]

Officer Squiller testified to substantially the same series of events. He stated that he could not make an identification based on height or weight, but rather stated that his identification rested primarily on the hair length and color. Officer Squiller said that he believed appellant most resembled Suspect No. 2. On questioning by the court, Squiller stated that even after the contraband was removed from the pockets of appellant he could not tell what it was. Additionally, Squiller testified that the lighting in the bus was adequate.

Appellant testified that the officers conducted a complete body search, not a pat-down. He testified that while he was reaching for his identification the officers searched through his coat, which he was not wearing at the time. He further testified that he was five feet seven inches tall, that he had brown hair, and that he was nineteen years old at the time of his arrest. This description is corroborated by the information taken when appellant was booked. In addition, the booking sheet stated that appellant weighed one hundred fifty pounds, wore glasses and had no identifying marks.

---

2. It should be noted that Officer Michaels was confusing the descriptions of the two suspects. Suspect No. 1 was believed to have shaggy black hair. Suspect No. 2 was believed to have blond or black hair.

Appellant's motion for suppression of evidence was denied. He was found guilty of possession of narcotics and dangerous drugs, placed on one year's probation, and ordered to pay the costs of prosecution. Appellant's post-trial motions in arrest of judgment and for a new trial were denied. This appeal followed.

The Commonwealth attempts to justify the search in the instant case as a precautionary search for weapons. *Terry v. Ohio*, 392 U.S. 1 (1968), provides that if a police officer accosts a person on the street and restrains him of his freedom to walk away, he has "seized" that person, and if he merely explores just the outer surface of such a person's clothing, that is a "search", and such a search and seizure are within the purview and protection of the Fourth Amendment. "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry,* supra at 19-22 (citations omitted). We must determine whether there was a *reasonable* basis for believing the person stopped was involved in criminal activity and whether there was a *reasonable* basis for believing the person stopped was dangerous.

In *Commonwealth v. Berrios,* 437 Pa. 338, 263 A. 2d 342 (1970), the Pennsylvania Supreme Court reversed Berrios' conviction for carrying a concealed deadly weapon because the stop and frisk of Berrios was deemed unlawful. In *Berrios,* the appellant was stopped twenty minutes after a reported shooting. Berrios and a companion were walking about three blocks away from the

scene. Nothing about their persons or conduct indicated they were armed and dangerous. Berrios and his companion were stopped because their race and age corresponded to the suspected assailants. The court stated at p. 341: "A search on this ground is justified only when 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger': Terry v. Ohio, supra at 27, 88 S. Ct. at 1883. In other words, the sole justification for such a search is the protection of the police officer or others nearby. Moreover, the arresting officer must be able 'to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.' Sibron v. New York, 392 U.S. 40, 64, 88 S. Ct. 1889, 1903 (1968)."

In *Commonwealth v. Hicks*, 434 Pa. 153, 157, 253 A. 2d 276 (1969), our Supreme Court held a precautionary weapons search to be unwarranted where police stopped and patted-down a burglary suspect whose only resemblance to the person sought was that he was a Negro of approximately the same age. The Court stated that *specific conduct of the seized person must be observed by the police, which would justify and make reasonable a belief that the suspect presented a danger to the officers or to others nearby.* 434 Pa. at 160.

In the instant case, the officers do not point to any specific suspicious conduct on the part of the appellant. The only justification for the search of the appellant offered by the officers was his alleged resemblance to one of two suspects in a police murder committed the day before. In examining the contradictory testimony of the officers, I observe the following. Officer Michaels believed he was dealing with Suspect No. 1, a man described as white, twenty years old, five feet eight or nine, slender build, one hundred fifty pounds, with long, black shaggy hair, and named Mark "Stoney" Geddis. Officer Squiller believed appellant most resembled Suspect No.

2, a man described as white, five feet eleven inches, one hundred eighty pounds, with neat long, thin hair and sideburns dyed black or blond, having a distinguishing facial mark and believed to be Charles Eugene "Crazy" Koons. Appellant was a white male, nineteen years of age, one hundred fifty pounds, five feet seven, with brown hair and no facial marks. Suspect No. 1 was an inch or two taller than appellant. Appellant and Suspect No. 1 had different color and style hair: the suspect had black shaggy hair; appellant's was variously described as brown or light brown by both officers. Suspect No. 2 was a full four inches taller than appellant, weighed thirty pounds more, had an identifying facial mark which appellant did not have, and was believed to have hair and sideburns dyed black or blond.

Appellant did not act in a suspicious or threatening fashion; quite the opposite, it is clear that appellant complied with the officers' request to produce identification. The identification he produced did not suggest that he was one of the persons being sought; it further negated reasonable suspicion. I note that the officers did not testify that they approached appellant with weapons drawn; rather, they say that they first asked appellant to reach into his pockets to produce identification, and then asked him to empty his pockets. These facts suggest that the officers were not fearful that the bulges which they felt were weapons. The record is devoid of facts which would support the officers' belief that appellant was linked in any way with the crime for which he was initially stopped. It is equally devoid of facts which would support a reasonable belief that appellant was armed and dangerous—or for that matter, that the officers were even motivated at the time by considerations of personal safety. If the resemblance between the suspects and appellant was insufficient in *Hicks* and *Berrios* to warrant precautionary weapons searches, then certainly the scant resemblance here must warrant the same result. See

320

*Commonwealth v. Hicks,* supra; *Commonwealth v. Berrios,* supra; *Commonwealth v. Reece,* 437 Pa. 422, 263 A. 2d 463 (1970).

I would therefore reverse the judgment of the lower court and remand for a new trial.