373 A.2d 1076
COMMONWEALTH of Pennsylvania
v.
Robert PERKINS, Appellant (two cases).

Supreme Court of Pennsylvania.
Submitted Nov. 15, 1976.
Decided June 3, 1977.

120

Stewart A. Bernstein, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

EAGEN, Chief Justice.

On March 4, 1975, appellant, Robert Perkins, was convicted by a jury of murder of the second degree, robbery, conspiracy and possession of an instrument of crime. Following the denial of post-verdict motions, a sentence of life imprisonment was imposed on the murder conviction. Prison sentences were also imposed on the robbery conviction (10–20 years) and the conspiracy conviction (5–10 years), these sentences to run concurrently with the life sentence, but consecutively to one another. Sentence was suspended on the conviction of possession of an instrument of crime. Perkins filed a direct appeal to this Court from the judgment of sentence on the murder conviction. The judgments of sentence on the robbery and conspiracy convictions were appealed to the Superior Court, which certified that appeal to this Court.

Perkins advances numerous assignments of error in support of reversal of the judgment and the grant of a new trial. For the reasons stated herein the judgments of sentence are affirmed.

The Commonwealth's evidence may be summarized as follows. On August 25, 1974, at approximately 8:17 a. m. the body of one Garvin Peters was discovered amidst the rubble and debris of an abandoned property at 1636

North Franklin Street, Philadelphia. According to the testimony of Detective Robert Flannery, the officer who found the body, the victim's hands were tied and the body was lying in a pool of blood; also the victim's trouser pockets, one of which was torn, were turned out. The victim was pronounced dead at the scene and the cause of death was later established as multiple (eight) stab wounds of the chest and back. The medical examiner estimated the time of death as between 6:30 p. m. and 11:30 p. m. the previous night, August 24, 1974. The medical examiner also testified that the victim had cuts and bruises about his lips and that the victim's wounds were consistent with the type of wound which could be inflicted with a kitchen knife. He further opined that the victim was intoxicated at the time of death since the toxicology report indicated the alcoholic content of the victim's blood was .21 percent.

Detective Wilford Doyle, the assigned investigator in the case, testified he interviewed the victim's wife shortly after the discovery of the body and, as a result thereof, issued a police alert to be on the lookout for the victim's automobile, a dark green 1973 Oldsmobile Delta 88 with a white vinyl top, license plate number 61J–444. This automobile was located that afternoon at a parking lot at 15th Street and Columbia Avenue. The automobile's front fenders were damaged and the left front tire was flat.

Gregory Page testified next for the Commonwealth and related that he saw Perkins (although at the time he knew him only by the name "Halfgun") on August 25, 1974, at approximately 1:30 a. m. in the neighborhood of 1714 North 15th Street, near Columbia Avenue. According to Page's testimony, Perkins and another individual named Thor were having a discussion concerning whether Thor was sober enough to drive a certain automobile, which Page identified as a green white-topped 1973 Delta 88, parked on 15th Street near the corner of Columbia

Avenue. The result of the discussion was that Perkins took something[1] from his pocket and handed it to Thor, who then drove away in the car. Page further related that the same vehicle was parked in the parking lot at 15th Street and Columbia Avenue at 7:45 a. m., August 25, 1974, and that he observed the police photographing this automobile at 4:30 p. m. the same day. At trial Page identified the photographs taken by the police of the automobile found at 15th and Columbia as being photographs of the same car he referred to in his testimony.

The Commonwealth also introduced two statements made by Perkins on August 29, 1974, at the Police Administration Building. The first statement, made to Detective Raymond Dougherty between 7:15 a. m. and 8:53 a. m., was exculpatory in nature. The second statement, however, made to Detective William O'Brien between 9:02 a. m. and 9:50 a. m., was incriminating. The substance of the second statement was as follows: On the night of August 24, 1974, Perkins and an individual named Chinaman[2] decided to go to a party. After picking up a knife[3] at Chinaman's house ("in case there was any trouble at the party"), the pair had proceeded on their way, when it began to rain. They stopped at a Gino's restaurant where Chinaman asked "this old guy" [Peters], who was "drunk or something" for a ride to the party. Peters indicated he would give Chinaman a ride and went out to his car; Perkins and Chinaman followed. When Peters realized Perkins was also coming,

1. During direct examination Page testified Perkins took a set of keys from his pocket and handed them to Thor. He conceded, however, during cross-examination he did not actually see keys.
2. During the interrogation by Detective O'Brien, Perkins identified a photograph of David Jones as being a photograph of Chinaman. Jones was also prosecuted and convicted of murder of the second degree, robbery and conspiracy in connection with Peters' death. See *Commonwealth v. Jones*, Nos. 1032–34, September 1974 (C.C.P., Philadelphia, 1975).
3. Perkins' statement described the knife as having "a long skinny blade," "about seven or eight inches," and "a gray wood handle."

he refused to take them; a fight ensued during which Chinaman punched Peters in the face and Perkins stabbed him in the back a number of times. The two put Peters, who was "still moving around," in the back seat of the car, tied his hands, went through his pockets and took his wallet. At Chinaman's direction, Perkins drove the car to a "little street" where they dumped Peters, who was "still moving around," behind some houses. At this point, Perkins gave Chinaman the knife to dispose of and they then drove to the party at 11th and Huntington Streets. Following the party, the two again took the car, with Chinaman driving. After Chinaman "crashed two times," Perkins took control and drove the car down to 15th Street, where "everybody else was driving it around."

Initially, Perkins contends he is entitled to a new trial because his confession should have been suppressed as the product of an unnecessary delay between arrest and arraignment in violation of Pa.R.Crim.P. 130 and *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972) [hereinafter *Futch*]. We do not agree.

Considering only the evidence presented by the Commonwealth and so much of the evidence for the defense as remains uncontradicted, *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth v. Boone,* 467 Pa. 168, 354 A.2d 898 (1975), the following facts were established at the suppression hearing: Perkins was arrested without a warrant on August 29, 1974, at 6:50 a. m. at his residence by Detectives Doyle and Dougherty. He was transported to the Police Administration Building and placed alone in an interview room at 7:01 a. m. At 7:15 a. m. he was questioned by Detective Dougherty who initially identified himself and informed Perkins he was being questioned "concerning the homicide by stabbing of Garvin Peters, fifty three, Negro male, residence—1922 West Willard Street, found on the highway in the rear of 1636 North Franklin Street

on Sunday, August 25th, 1974." Dougherty advised Perkins of his rights as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked him the accompanying questions on a standard police interrogation card. Perkins' answers to those questions indicated an awareness of his rights and a willingness to waive them. Perkins denied any knowledge of the killing, but expressed a willingness to take a polygraph examination. This interview was concluded at 8:53 a. m. and Perkins was left alone until 9:02 a. m., when the questioning was continued by Detective O'Brien. O'Brien identified himself and Detective Doyle, who was also present, and again informed Perkins he was being questioned in connection with Peters' death. O'Brien also advised Perkins of his constitutional rights and asked the accompanying questions from the police interrogation card. Perkins again indicated his willingness to answer questions without the presence of an attorney. Almost immediately after the interview began Perkins made an incriminating statement, which was recorded on a typewriter by O'Brien as Perkins spoke. This statement was concluded by 9:50 a. m. Perkins was then allowed to use the lavatory and at 10:10 a. m. he was given a sandwich, coffee and cake. Between 10:35 a. m. and 10:50 a. m. Perkins read and signed each page of the statement. The suppression hearing record further establishes that Perkins was alert and responsive throughout both periods of questioning, he exhibited no signs of being under the influence of drugs or alcohol, he made no complaint of any physical discomfort, and he was not threatened, harassed or physically abused. He was arraigned at approximately 1:30 p. m.

The relevant time period to be considered in evaluating a *Futch* claim is that between arrest and the incriminating statement. *Commonwealth v. Taylor*, 472 Pa. 1, 370 A.2d 1197 (1977); *Commonwealth v. Perry*, 468 Pa. 515, 364 A.2d 312 (1976); *Commonwealth v.*

128

*Palmer,* 463 Pa. 26, 342 A.2d 387 (1975); *Common-wealth v. Rowe,* 459 Pa. 163, 327 A.2d 358 (1974). Here, Perkins began his incriminating statement shortly after 9:00 a. m., approximately two hours and ten minutes after his arrest.[4] Such a short period of time has never been held to be offensive to the *Futch* rule. *Commonwealth v. Boone,* supra. Based on these facts we find there was no *Futch* violation instantly. See *Commonwealth v. Taylor,* 472 Pa. 1, 370 A.2d 1197 (1977); *Commonwealth v. Boone,* supra; *Commonwealth v. Ter-valon,* 463 Pa. 581, 345 A.2d 671 (1975); *Commonwealth v. Palmer,* supra; *Commonwealth v. Young,* 460 Pa. 598, 334 A.2d 252 (1975); *Commonwealth v. Rowe,* supra. Accordingly, Perkins' contention his confession should have been suppressed is rejected.[5]

4. Compare *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977), wherein we announced, pursuant to our supervisory power, a six-hour rule governing the admissibility of statements made by an accused while in custody before arraignment.

5. Perkins also asserts his confession should have been suppressed as the product of an illegal arrest since he was arrested without a warrant on allegedly less than probable cause.

Probable cause exists if "the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Commonwealth v. Culmer,* 463 Pa. 189, 195, 344 A.2d 487, 490 (1975). Considering only the evidence presented by the Commonwealth and so much of the evidence for the defense as remains uncontradicted, *Commonwealth v. Johnson,* supra; *Commonwealth v. Boone,* supra, the suppression hearing record establishes the police knew that Peters had been stabbed to death and robbed and that the automobile he had been driving, a green and white 1973 Oldsmobile, had been taken. This automobile was found at 15th Street and Columbia Avenue on August 25, 1974. Upon further inquiry, Detective Doyle learned from Gregory Page that Perkins was operating this vehicle on the morning of the 25th at approximately the same time Peters' body was discovered. Based upon these facts we are of the view probable cause existed to arrest Perkins. See and compare *Commonwealth v. Wilder,* 461 Pa. 597, 337 A.2d 564 (1975); *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963). See also *Commonwealth v. Murray,* 437 Pa. 326, 263 A.2d 886 (1970).

■■ The next group of assignments of error relates to the trial court's refusal to instruct the jury according to several points of charge requested by the defense.[6] Two of these requested points amounted to binding instructions in favor of Perkins on the issues of felony-murder and robbery. As such, Perkins' claims of error with respect to these points turn on an evaluation of the sufficiency of the evidence. Perkins argues that since Peters' wallet and automobile were taken after the stabbing occurred, the theft and the killing were independent of one another; therefore, he asserts, the evidence establishes neither robbery nor felony-murder. This argument totally ignores, however, our standard of review and the long-standing principle that "if the killing is used to effectuate the robbery then it is immaterial that the intent to kill preceded the intent to rob since the force resulting in death is the force used to accomplish the robbery." *Commonwealth v. Butcher*, 451 Pa. 359, 363, 304 A.2d 150, 153 (1973). Accord, *Commonwealth v. Tomlinson*, 446 Pa. 241, 284 A.2d 687 (1971); *Commonwealth v. Waters*, 445 Pa. 534, 285 A.2d 192 (1971); *Commonwealth v. Wilson*, 431 Pa. 21, 244 A.2d 734 (1968); *Commonwealth v. Hart*, 403 Pa. 652, 170 A.2d 850 (1961).

■ The test for evaluating the sufficiency of the evidence in a criminal case is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom upon which the jury could properly have based its verdict, there is sufficient evidence to enable the trier of fact to find beyond a reasonable doubt every element of the crime of which the accused has been convicted. *Commonwealth v. Brown*, 467 Pa. 388, 357 A.2d 147 (1976); *Commonwealth v. Edwards*, 466 Pa. 336, 353 A.2d 383 (1976);

6. We note with disapproval that Perkins' brief does not set forth these requested points for charge nor are they contained in the record. They are, however, set out in the Commonwealth's brief.

*Commonwealth v. Swint,* 465 Pa. 450, 350 A.2d 851 (1976). So viewed the evidence in the instant case is clearly sufficient to sustain the judgments entered in the trial court.

Perkins' other requested points at issue concern the adequacy of the trial court's charge to the jury in explaining (a) intoxication and (b) the jury's duty to decide the case without prejudice or bias. Prior to the court's charge, Perkins submitted a requested instruction relating to intoxication as it affects the capacity to form the specific intent requisite for first degree murder.[7] Although there was some question as to whether the evidence warranted an intoxication charge,[8] the trial court nevertheless instructed the jury that evidence of intoxication, either from the use of alcohol or drugs, may be offered whenever it is relevant to negate an element of the crime charged. The court went on to elaborate upon this principle in terms of negating specific intent to kill, as requested, and the facts of the instant case. Perkins now argues the trial court's intoxication instruction was insufficient and confusing because it did not include the statement that if Perkins was so intoxicated as to be incapable of forming the specific intent to kill, the jury could find him guilty of no more than murder of the third degree. It is well-established, however, that the trial court is not required to accept the point submitted

7. At no point in these proceedings has Perkins argued he was entitled to have the jury instructed on intoxication as it relates to the capacity to form the intent requisite for robbery. See *Commonwealth v. Graves,* 461 Pa. 118, 334 A.2d 661 (1975). But see 18 Pa.C.S.A. § 308, as amended, Act of April 7, 1976, P.L. 72, No. 32, § 1.

8. The only reference to the consumption of alcohol or drugs was contained in Perkins' confession: "On Saturday night me and Chinaman went around and got some monster [methamphetamine]. We went around the State Store and got a half gallon of wine. After that we were just sitting around drinking. We started drinking. Chinaman said he knew where a party was." See and compare *Commonwealth v. Kichline,* 468 Pa. 265, 361 A. 2d 282 (1976).

by counsel verbatim, but is free to use its own form of expression. The only issue is whether the substance of the instruction requested is adequately and accurately presented to the jury. *Commonwealth v. McComb*, 462 Pa. 504, 341 A.2d 496 (1975). The record here indicates the trial court gave careful and accurate instructions as to all three degrees of murder as well as intoxication as negating specific intent. See *Commonwealth v. Rose*, 457 Pa. 380, 321 A.2d 880 (1974). This was all Perkins requested.

Similarly, the record indicates the trial court more than once instructed the jury they were to decide the case only on the basis of the evidence presented at trial and free from any bias or prejudice. Thus, reviewing the court's charge as a whole, *Commonwealth v. Boone*, supra; *Commonwealth v. Davenport*, 462 Pa. 543, 342 A.2d 67 (1975); *Commonwealth v. Rodgers*, 459 Pa. 129, 327 A.2d 118 (1974), we find the court's instructions were sufficient to properly guide the jury in their deliberations in the instant case.

Perkins also complains that the trial court's supplemental instructions were insufficient. After the jurors retired and had been deliberating for three and one-half hours, they returned for further instruction. The record shows the jury requested that the definitions of murder of the first and second degree be repeated. The trial court again defined these offenses and at the conclusion of these supplemental instructions inquired: "Is that clear, the distinction between the two? Is that all you wanted to hear?" The record shows the jury responded in the affirmative, whereupon the court directed them to resume deliberations. After the jurors returned to the jury room, defense counsel requested the court to also reinstruct the panel on the penalties for murder of the first and second degree and on intoxication as it relates to specific intent to kill. Perkins now contends it was error to refuse these requests.

The decision whether to respond to a jury request for supplemental instructions rests within the sound discretion of the trial court and likewise, when the court gives such instructions, the scope of those instructions is also a matter resting within the court's discretion. Accordingly, when the court provides supplemental instructions at the jury's request, it may confine those instructions to the particular questions asked by the jury, even though requested by the defendant to give yet additional instructions. *Commonwealth v. Boone,* supra; *Commonwealth v. Tervalon,* supra; *Commonwealth v. McNeil,* 461 Pa. 709, 337 A.2d 840 (1975); ABA Project on Standards for Criminal Justice, Standards Relating to Trial by Jury, § 5.3(b).

(Approved Draft, 1968). The trial court's supplemental instructions here were directed at the precise question posed by the jury and Perkins does not quarrel with the accuracy of these instructions. Moreover, the record shows the jury received adequate and accurate instructions as to the penalties for the different degrees of murder and intoxication as it relates to specific intent in the original charge. Thus, we are not persuaded the trial court abused its discretion in refusing Perkins' request for additional instructions.[9]

Perkins next asserts the trial court erred in refusing to grant a motion for mistrial based on an alleg-

[9]. Perkins' contention that the trial court had a duty to reinstruct the jury as to the penalties for murder of the first and second degree is apparently based on 1311(b) of the Sentencing Code, 18 Pa.C.S.A. § 1311(b) (Supp.1976–77). We point out, however, that § 1311(b) states in pertinent part: "In a trial for murder, the court shall inform the jury *prior to their deliberations,* as to the penalties for murder of the first degree, murder of the second degree and murder of the third degree." That section does not require an instruction as to the penalties for the different degrees of murder any time instructions are given defining the substantive elements of those offenses; it requires only that the jury be apprised of the penalties for each degree of murder *prior to their deliberations.* Here, the trial court fully complied with § 1311(b) in its original charge.

edly improper expression by the assistant district attorney of his personal belief in the truth of Perkins' confession.[10] Needless to say, this is a serious allegation. It is emphatically clear that the expression of personal opinion or belief on issues which are within the province of the jury has no place in the argument of a district attorney to the jury. Indeed, the cases recognizing this principle are legion. See, e. g., *Commonwealth v. Cronin,* 464 Pa. 138, 346 A.2d 59 (1975); *Commonwealth v. Lark,* 460 Pa. 399, 333 A.2d 786 (1975); *Commonwealth v. Harvell,* 458 Pa. 406, 327 A.2d 27 (1974); *Commonwealth v. Russell,* 456 Pa. 559, 322 A.2d 127 (1974); *Commonwealth v. Lipscomb,* 455 Pa. 525, 317 A.2d 205 (1974); *Commonwealth v. Toth,* 455 Pa. 154, 314 A.2d 275 (1974); *Commonwealth v. Potter,* 445 Pa. 284, 285 A.2d 492 (1971). However, it is also true that not every in-

10. The Commonwealth argues, inter alia, this issue has been waived because defense counsel did not object to the assistant district attorney's remarks at the time they were made. Immediately after the assistant district attorney finished his closing argument the trial court dismissed the jury for the day. Defense counsel then entered his objection and moved for a mistrial.

The purpose of the rule requiring an objection during argument is to ensure an accurate record on appeal. Where the argument is unrecorded, it is necessary to require an objection during argument so the challenged remarks can be placed in the record at or about the time they are made. Otherwise, the recollection of both counsel and the court may differ and thereby result in unnecessary factual disputes. *Commonwealth v. Adkins,* 468 Pa. 465, 364 A.2d 287 (1976); see *Commonwealth v. Mika,* 317 Pa. 487, 177 A.2d 3 (1935); *Commonwealth v. King,* 227 Pa.Super. 168, 323 A.2d 260 (1974). But where, as here, the argument is recorded and the content is available to both counsel and the court at the conclusion thereof, no similar necessity exists, and thus, the rule requiring objection during argument is inapplicable. *Commonwealth v. Adkins,* supra. We hasten to add, however, that while an objection may not be necessary at the time the challenged remarks are made, a specific objection must be made at the end of the argument. See *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974).

Since the arguments were here recorded and their content undisputed, the trial court was properly made aware of the nature of the objection to the assistant district attorney's summation and had adequate opportunity to attempt to correct the alleged impropriety. Hence, we will consider the merits of Perkins' claim. *Commonwealth v. Adkins,* supra.

temperate and improper remark by the prosecution will require a new trial. "The language must be such that its 'unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.'" *Commonwealth v. Stoltzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975), quoting *Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968).

The effect of the remarks challenged instantly must be evaluated in the context in whch they occurred. *Commonwealth v. Stoltzfus*, supra. Perkins' brief quotes only a single sentence from the assistant district attorney's summation. However, in order to put these remarks into proper perspective, it is helpful to recount the circumstances leading up to them. In his closing argument, defense counsel called the jury's attention to the fact that, prior to his confession, Perkins denied any involvement in Peters' death. Defense counsel also pointed out that Gregory Page, when first questioned by the police, gave a statement which did not mention Perkins or Peters' automobile, but upon further questioning by the police, Page gave a statement implicating Perkins which was consistent with his testimony at trial. Defense counsel then made the following argument to the jury with respect to these facts:

"So Gregory gives one statement and he gives another statement. Barry Perkins gives one statement and gives another statement. If the detectives believed the first statement given by both parties, we wouldn't be here today. *The district attorney and the detectives chose to believe the other statements* and that's why we're here today and that's why the decision is before you *because they chose to believe two different statements,* the second one given hours after being examined initially." [Emphasis added.]

In response the assistant district attorney in his summation stated:

"The defense has said, I believe, the district attorney chooses to believe the second statement, the district attorney chooses to believe the second statement of Gregory Page and the second statement of this defendant. Well, normally my beliefs aren't very important. My duty and my beliefs are not entwined. They have been brought—they've been brought before you by the defense. And I must say to you if I believed otherwise not only would I do it, because that's the kind of person I am, but that's the oath of office that I take. That's my responsibility to justice. We seek no victims. If I didn't think that confession were true, if I didn't believe that, it would be my duty to stand up here and say so and we would never have been this far. Like I said, I only say this in connection with the fact that I believe this or I believe that had been brought to your attention by the defense attorney.

\* \* \* \* \* \* \* \*

"That's another thing now that I've said in responding. I don't want you to say to yourself my goodness, Mr. Kogan, he seems like a nice young guy. He wouldn't be doing this unless he truly believed it. You know, don't—don't over-abstract what I just said. On the other hand, you may think I'm a terrible person. And try to keep that out of your mind as best you can, as well. But certainly the other way, don't say to yourself well, if I'm saying it it's got to be so, he must be guilty, otherwise I would have dropped the case. Examine the evidence, what's been testified to, what's been sworn to, and when you do you're going to come away with only one conclusion  . . . ."

While we do not approve of the assistant district attorney's remarks, it cannot be said they were wholly gratuitous or uncalled for. It is clear the challenged remarks were made in response to an argument that can be chari-

tably described as ill-advised. Indeed, defense counsel's remarks could be construed as an attack upon the prosecutor and as such, in violation of defense counsel's duty to avoid acrimony in his relations with opposing counsel and his duty to confine his argument to the record evidence. See ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and The Defense Function, § 7.8(c) (The Defense Function), Commentary (Approved Draft, 1971). Moreover, it is significant that the assistant district attorney tempered his remarks and urged the jurors to decide the case on the evidence presented to them. Finally, it is worth noting that the trial court in its charge instructed the jury to disregard any expression of opinion as to credibility, weight of the evidence, or guilt of the defendant, specifically the remarks challenged here. Considering the circumstances surrounding that portion of the assistant district attorney's closing argument complained of, and viewing it as inspired by the argument of defense counsel, we conclude the trial court did not abuse its discretion in refusing to declare a mistrial. *Commonwealth v. Stoltzfus*, supra; see ABA Project on Standards for Criminal Justice, Standards Relating to The Prosecution Function and The Defense Function, § 7.8(a) (The Defense Function), Commentary (Approved Draft, 1971). Cf. *Commonwealth v. Davenport*, 462 Pa. 543, 342 A.2d 67 (1975); *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680 (1974); *Commonwealth v. Westwood*, 324 Pa. 289, 188 A. 304 (1936).

Perkins next contends the trial court improperly restricted defense counsel's summation. As noted earlier, Gregory Page testified at trial for the Commonwealth; the thrust of his testimony was that he saw Perkins on August 25, 1974, at approximately 1:30 a. m. in the neighborhood of 15th Street and Columbia Avenue in control of the keys to Peters' automobile. During his testimony, Page related that at that time he had a brief

conversation wth Perkins, who inquired as to the whereabouts of Page's brother. The defense introduced into evidence the fact that Page told the police his mother said Page's brother had also been driving the car. This evidence, however, was admitted for the limited purpose of showing that such a statement had been made to Page before he spoke with the police, rather than showing that Page's brother had been driving the car. Perkins now complains he should have been allowed to make an argument based on the theory that when he spoke to Page regarding Page's brother he was attempting to return the car keys to Page's brother. This argument does not have even an arguably logical basis in the evidence contained in the instant record and thus, we perceive no error in the trial court's action.

Perkins' final assertion is that the trial court erred in denying a motion to dismiss the charges against him on the ground of a violation of Pa.R.Crim.P. 1100(a)(2) which provides, in pertinent part: "Trial . . . shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed." Perkins was arrested on August 29, 1974, and charged in connection with Peters' death. On February 25, 1975, the 180th day from the date of the complaint, Perkins appeared with counsel before the Court of Common Pleas of Philadelphia. The court announced the case of "Commonwealth versus Robert Perkins" and asked the parties if they were ready to proceed. Defense counsel responded affirmatively and the assistant district attorney moved for trial on the bills of indictment against Perkins. Perkins was then brought before the bench, sworn, and questioned by the court as to whether he understood the charges against him, whether he was satisfied with his counsel's representation, and whether it was correct he was requesting a jury trial. Perkins responded affirmatively, whereupon the court made the

following statement with respect to the availability of a jury panel:

"THE COURT: All right. We are checking on the availability of a jury at this point. The best estimate is that one will be brought down first thing tomorrow morning. At this moment we don't have enough jurors to put together a jury, but the case is on trial as of now and we will proceed with it as soon as the panel can be brought down.

Do you have any questions for the Court concerning your trial?

"THE DEFENDANT: No."

The court then granted a request by defense counsel that Perkins be allowed to visit with his mother for a few minutes and recessed until the next morning without objection by Perkins. On February 26, 1975, court reconvened with the jury panel present. Perkins was again brought before the bench, sworn, informed of the charges against him; after indicating his intention to plead not guilty to all charges, Perkins was also informed of his right to challenge the members of the jury panel. After the trial court, defense counsel and the assistant district attorney next addressed the jury panel, and the panel was sworn, defense counsel made an oral motion to dismiss the charges against Perkins on the basis that the 180-day rule had been violated. The thrust of Perkins' argument is that trial did not "commence" on February 25, 1975, because the trial court did not direct the parties "to proceed to voir dire, or to opening argument, or to the hearing of any motions which had been preserved for the time of trial, or to the taking of testimony or to some other such first step in the trial." Pa. R.Crim.P. 1100, Comment.[11] We need not decide, however, whether Perkins' trial "commenced" on February

11. See and compare Pa.R.Crim.P. 1100(b) which provides: "For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial."

25, 1975. Even assuming trial did not commence until February 26, 1975, Perkins waived his Rule 1100 claim by failing to raise the issue in a timely fashion. Pa.R. Crim.P. 1100(f) provides that a defendant or his attorney may apply for dismissal of the charge on the ground Rule 1100 has been violated, "[a]t any time *before* trial." (Emphasis added.) The record shows Perkins did not assert his Rule 1100 claim until *after* the jury panel had been sworn and addressed by both counsel and the court, as well as after Perkins had again been sworn, informed of his right to challenge members of the jury panel, and read the charges against him, to which he indicated an intention to plead not guilty. Under these circumstances, we are of the view Perkins failed to raise the issue of an alleged violation of Rule 1100 until after his trial had commenced and thus, the issue is waived. Cf. *Commonwealth v. Roundtree,* 458 Pa. 351, 326 A.2d 285 (1974); *Commonwealth v. Hickson,* 235 Pa.Super. 496, 344 A.2d 617 (1975).

In sum, we have carefully considered each and every complaint Perkins now asserts and find no reason to interfere with the judgments entered in the trial court.

The judgments are therefore affirmed.

JONES, former C. J., did not participate in the decision of this case.

ROBERTS, J., concurs in the result.

NIX, J., concurs in the result.

MANDERINO, J., concurs in the result.