403 A.2d 596

**COMMONWEALTH of Pennsylvania**

v.

**Raymond PATTERSON, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 15, 1978.

Decided May 11, 1979.

Reargument En Banc Denied
July 30, 1979.

---

Elaine DeMasse, Assistant Public Defender, Philadelphia, for appellant.

Eric B. Henson, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before CERCONE, SPAETH and LIPEZ, JJ.

LIPEZ, Judge:

Appellant was found guilty, by a judge sitting without a jury, of aggravated assault, robbery, burglary, and criminal conspiracy in connection with the burglary and robbery of a

Mr. and Mrs. Martin Robinson. Following denial of post-trial motions, he was sentenced to three terms of two to five years imprisonment and one term of four to ten years imprisonment, all to run concurrently. On this appeal, appellant claims that he is entitled to a new trial for the reasons that certain inculpatory statements were improperly admitted because: (1) The Commonwealth failed to establish probable cause for his arrest, and therefore his statements, as the fruits of this illegal arrest should have been suppressed; and (2) his statements should have been suppressed as violative of Pa.Rule Crim.Pro. 130 since he was not arraigned until twenty-eight hours after his arrest and his initial inculpatory statement, given seven hours after his arrest was prejudicial and related to the delay.

The situation here is somewhat unusual. It arose out of the fact that appellant was arrested without a warrant by the police for an entirely unrelated offense, to-wit, the homicide of Albert Dixon, for which he was not ultimately charged. After his arrest and while in custody he gave police a statement implicating himself in the Robinson offenses. To sustain the arrest, the Commonwealth therefore was required to show that under the circumstances there was probable cause for the appellant's arrest for the Dixon homicide, and that their mistake was a reasonable one. *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971); *Commonwealth v. Pinney*, 236 Pa.Super. 309, 312–13, 344 A.2d 596 (1975).[1] We think the arrest for the Dixon homicide lacked probable cause and that the statements were the fruits of an illegal arrest.

The circumstances giving rise to the appellant's arrest, as disclosed at the suppression hearing, may be stated as follows: On August 11, 1975, Albert Dixon was found sitting in a car at 68th and Ogontz Avenues in Philadelphia with a wound in the side. At that time police investigators found a

1. Both *Hill* and *Pinney* hold that when police have probable cause to arrest one party, and they reasonably mistake a second party for the first party, the arrest of the second party is a valid arrest.

spent .25 calibre shell under the victim's car. Later Dixon died and then Detective Kane began an investigation of his death.[2] He interrogated some fifteen to eighteen juveniles from the 68th and Ogontz area at the Police Administration Building. As a result of the interrogation of these persons he obtained the name of Larry Cooper. On October 18, 1975, Kane spoke with Larry Cooper. Cooper told Kane that sometime after his return from "down south" on September 24, 1975, he overheard appellant Raymond Patterson say, "I had to bust the man in the ass when I was robbing him." When Cooper asked Patterson to name the man he had "busted", Patterson refused (S. H. p. 8). Cooper also overheard Patterson say, "[he] was going to do something with a gun," but heard nothing more. Cooper told Kane he saw the gun to which Patterson had referred; it was a "small black gun with a clip."[3] Kane then showed Cooper a photograph of Patterson which Cooper identified as the man he had overheard. (S. H. 8).

Kane concluded that he had probable cause to arrest the appellant for the shooting of Dixon based on the following facts and circumstances:

1. A .25 calibre shell was found near the car in which Dixon had been found shot. From this Kane inferred that Dixon had been shot with a .25 calibre gun and that the gun had been automatic since a revolver would not have ejected a shell. (S. H. p. 10). Cooper said he saw Patterson with a small gun with a clip which indicated to Kane that the gun was a small calibre automatic. (S. H. 10).

2. Patterson had told Cooper that he had busted someone in the ass when he was robbing him. Since Dixon had

2. Kane was assigned to the case on August 11, the night of the shooting. On that day he saw the victim in the hospital and looked over the scene. He did nothing further until victim died.

3. The circumstance under which Cooper gained his information from Patterson was not brought out at the Suppression hearing. When Detective Kane was asked what relationship Cooper had with Patterson he said, "To the best of my knowledge he just knew him from the neighborhood." (S. H. 12).

been shot in the side above the buttocks[4] Kane figured Patterson was referring to the Dixon shooting. (S. H. 11). 3. "[t]he proximity of the area where defendant lived and where the incident occurred." Patterson lived seven blocks south and "a couple blocks" west of the place where Dixon had been shot. (S. H. 11).

On the basis of this information, Detective Kane ordered Officer Cohen to arrest Patterson. Patterson was arrested on November 8, 1975, without the issuance of a warrant. (S. H. 12–13).[5]

The court below held that the various factors considered by Detective Kane noted above reasonably led him to the mistaken conclusion that Dixon rather than Robinson was the appellant's victim; that it was a reasonable ground for belief of guilt and hence constituted probable cause. We think the court erred.

We think the approach by the Supreme Court in *Commonwealth v. Stokes*, 480 Pa. 38, 389 A.2d 74 (1978) in a case similar in many respects to the instant case[6] is especially

---

4. This was elicited by the assistant D. A. in response to a leading question on direct examination as follows: (S. H. 6)
   Q. Where on the defendant's person—strike that—where on the deceased person did the bullet enter?
   A. It would be on the left side.
   Q. Where in relation to the buttocks?
   A. It would be above the buttocks.

5. After Detective Kane received the information from Cooper, he relayed it to Officer Mark Cohen. He also gave Cohen a photograph of Patterson (S. H. 8) and told him "if he saw Patterson in the area would he pick him up, [Kane] wanted to talk to him concerning the homocide of Albert Dixon."

6. In *Stokes*, detectives learned that the defendant Stokes had told Anthony Ramsey that "he and some other guys had got a body up on 63rd Street." Later when police interviewed Ramsey he confirmed this information adding that Stokes told him "they had shot the white man on 63rd Street when they were out to rob somebody and that the man died." Further, he said that Stokes asked him not to tell anybody. The defendant gave certain incriminating statements to the police following his arrest. The court below ordered suppression of the defendant's statements, finding that the statements were the product of an illegal arrest. The Supreme Court affirmed.

helpful in our analysis here. (480 Pa., pp. 43–44, 389 A.2d, p. 76),

"The law is clear that a warrantless arrest is not lawful unless there is probable cause therefore . . . Whether there is probable cause to arrest without a warrant depends on whether, at the moment a suspect is taken into custody, the facts and circumstances within the officer's knowledge, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been committed and that the person to be arrested has committed the offense . . .

Thus, in order to arrest without a warrant, the officer must have a reasonable belief in the probability of criminal activity by the person to be arrested. However, that belief need not be grounded in the officer's direct, personal knowledge of the relevant facts and circumstances. It may, instead, rest solely on information supplied by another person where there is a "substantial basis" for crediting that information . . .

This Court has held that information provided by certain classes of persons may be sufficient to establish probable cause. It is well-settled that the uncorroborated confession of an accomplice which implicates the suspect will supply the probable cause for a warrantless arrest . . . Similarly, the statement of a victim, identifying the perpetrator of a crime, has been found sufficient to establish probable cause for that person's arrest . . . Further, information provided by an eyewitness whose identity is known has also been deemed sufficient . . . Thus, in determining whether probable cause exists, we have tended to credit information supplied by one who has some direct personal knowledge of the crime." (Citations omitted)

"It is well-settled that even hearsay information is sometimes sufficient to establish probable cause. *See Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). However, before an officer may con-

clude there is probable cause to arrest based on hearsay information, he must satisfy the two-pronged test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), as explicated in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969): (1) He must know the underlying circumstances from which the informer concluded the suspect participated in the crime; and (2) he must have some reasonable basis for concluding that the informant is credible or that his information is reliable. *See* also *Commonwealth v. Brooks*, 468 Pa. 547, 364 A.2d 652 (1976). The *Aguilar-Spinelli* requirements are exacted in order 'to assure that the tip is not merely an unsupported rumor' and 'to reduce the possibility that [it] is merely a well-constructed fabrication.' *In re Betrand*, 451 Pa. 381, 386, 303 A.2d 486, 488 (1973)." *Id.* 480 Pa. at 45, 389 A.2d at 77.

■ We point out first that the informant Cooper, as Ramsey in *Stokes*, was "neither an accomplice, nor an eyewitness, nor a victim of the crime," without "first hand knowledge of the crime," and that the information was entirely hearsay. Therefore, to establish probable cause on the basis of hearsay information we must determine whether it satisfies the two-pronged tests of *Aguilar*. These are sometimes referred to as "the basis of knowledge" and "veracity" prongs.[7]

7. W. LaFave, Search & Seizure § 3.3, pp. 501–502,
    "Under what is usually designated as the first prong of *Aguilar*, or might more precisely be called the 'basis of knowledge' prong, facts must be revealed which permit the judicial officer * making the probable cause determination to reach a judgment as to whether the informant had a basis for his allegations that a certain person had been, was or would be involved in criminal conduct or that evidence of crime would be found at a certain place. By contrast, under the second prong of *Aguilar*, properly characterized the 'veracity' prong, facts must be brought before the judicial officer so that he may determine *either* the inherent credibility of the informant *or* the reliability of his information on this particular occasion. That is, the second or 'veracity' prong of *Aguilar* may be said to have a 'credibility spur' and a 'reliability spur.'
    * It also applies to police claims of probable cause to make an arrest or search without a warrant. LaFave, supra, p. 501.

As to the underlying circumstances or basis of knowledge prong, it must be borne in mind that the information supplied by Cooper arose out of a dragnet type of investigation, from which the police obtained Cooper's name. The information supplied by Cooper was not such "underlying circumstances from which the informer concluded the subject participated in the crime" because Cooper obviously could not and did not so conclude. He simply stated to the police the information before noted which, as in *Stokes* "was conclusory and contained no detailed description of Stokes [Patterson] criminal activity. Moreover, the record is silent as to the circumstances under which Stokes [Patterson] admission was made as to Ramsey's [Cooper's] relationship with Stokes [Patterson] which might have explained why Stokes [Patterson] would have divulged such self-incriminating information as to him.[8]

There are other "basis of knowledge" deficiencies. The admission is in part contradicted by police knowledge of the Dixon shooting. Appellant purportedly admitted to busting a man in the "ass",[9] whereas Dixon had been shot in the side.[10] Appellant allegedly stated that he busted a man during a robbery. There is no indication that Dixon was robbed or subjected to an attempted robbery. In addition, reliance on Cooper's assessment of the gun as having a clip is questionable because there was no evidence at the suppression hearing to indicate that he had any familiarity with handguns. Cf. *United States v. Unger*, 469 F.2d 1283 (7th Cir. 1972), *cert. denied* 411 U.S. 920, 93 S.Ct. 1546, 36 L.Ed.2d 313 (police relied on informant's tip that defendant had a cache of certain military weapons in his basement. The informant had been an ordnance man in the army and was therefore familiar with the weapons that he described.)

8. *Stokes*, supra, 480 Pa. 45, 389 A.2d p. 77. Brackets inserted.

9. Additionally there is a question as to the validity of inferring that "bust" meant "shoot" because no testimony was introduced at the suppression hearing to indicate whether or not the two terms are synonymous in street argot.

10. See Footnote 4, supra.

Cooper's tip was deficient in two other significant respects. The information which he purportedly gathered contained no evidence linking it by time or place to the Dixon incident. Detective Kane linked appellant's admission to the place of the shooting because appellant lived only nine blocks from the scene. Our Supreme Court has expressed its distrust of this kind of link, calling it the "grossest form of unsupported speculation and guilt by association." *Betrand Appeal*, 451 Pa. 381, 387, 303 A.2d 486, 489 (1973). The suppression court linked the admission to the time of the shooting because it was made "about the time" of the incident. However, it was made at least forty-four days after the shooting and consequently too far removed from the incident to support such an inference. *Cf. Commonwealth v. Jones*, 473 Pa. 381, 374 A.2d 970 (1978) (on the night of the murder-robbery, defendant gave informant a ride in a car which he said he had taken from a man he had stabbed); *Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 (1977) (the morning after the robbery, informant saw defendant driving the stolen car).

█ We think it is clear therefore that the evidence fails to meet the first prong of the *Aguilar* test. Assuming, however, that the first requirement was met, we find, as the court did in *Stokes*, that "the record is clearly deficient in regard to the requirements of the second prong of [the] test." Using the LaFave approach [11] "with respect to the second or veracity prong of *Aguilar*, it is most common for the police to attempt to establish the credibility of the informant on the basis of his past performance." [12] No such attempt was made here.

"If no showing is made as to the informant's credibility, that is, if the informant's track record is not sufficiently established as in *McCray*,[13] then it is necessary to consider

11. See Footnote 7.

12. LaFave, supra, p. 502.

13. *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). Informant gave specific details as to sales of narcotics, the

the reliability spur whether it has been shown that the informant's information is reliable on this occasion."[14]  No such information was produced here.  Cf. *United States v. Spach*, 518 F.2d 866 (1975).

We conclude, therefore, that the information was not reliable; that the informant was not trustworthy, and hence there was no probable cause for the arrest.  The arrest was therefore illegal.

▪ We must now determine whether the incriminating statements were the fruits of the illegal arrest.  *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).  Though *Wong Sun* does not require that all evidence obtained subsequent to the illegal acts of the law enforcement officer must be suppressed, there must be a determination whether that evidence "has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Id.* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455.  In order to be purged, it must either have resulted from an intervening independent act of a free will[15] or the connection between the arrest and the evidence has become so attenuated as to dissipate the taint.[16]  *Commonwealth v. Collini*, 264 Pa.Su-

location where they had taken place, and pointed out the defendant. He had previously given various officers accurate information resulting in arrests and convictions.  The Supreme Court held that the credibility of the informant was sufficiently established.

14.  LaFave, supra, p. 502.

15.  Our Supreme Court holds that an "act of free will" means that the questioned evidence truly was given to the authorities voluntarily and that there was present no element of coerciveness due to the unlawful arrest.  *Commonwealth v. Bishop*, 425 Pa. 175, 183, 228 A.2d 661, 666 (1967).  Cert. denied 389 U.S. 875, 88 S.Ct. 168, 19 L.Ed.2d 159 (1967).

16.  *Wong Sun* is an illustration of attenuation dissipating the taint. Said the United States Supreme Court, "On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint' ", 371 U.S. 491, 83 S.Ct. 419, 9 L.Ed.2d 457 (as cited in *Commonwealth v. Brooks*, 468 Pa. 547, 560, 364 A.2d 652, 658 (1976).

per. 36, 398 A.2d 1044 (1979) (citing *Wong Sun*, supra). The burden of showing the purging of the taint rests on the Commonwealth. *Betrand Appeal*, supra, 451 Pa. at 389, 303 A.2d at 490.

■ The appellant was arrested on November 8, 1975, at about 1:30 p. m. Thereafter he was questioned intermittently, given *Miranda* warnings, and underwent polygraph examinations.[17] The first incriminating statement occurred at 8:20 with questioning thereafter continuing and a formal statement signed at 10:50 p. m. The period from arrest until the first statement was almost 7 hours, and the total time until the signing of the formal statement consumed over nine hours.

■ At the suppression hearing, the appellant testified that he was undergoing heroin withdrawal at the time, and

17. A chronology of the proceedings from the arrest to the incriminating statements and arraignment as constructed by the court below in its opinion is as follows:

Nov. 8, 1975:

1:30 p. m.   Defendant arrested for Dixon homicide.
2:15 p. m.   Defendant arrives in Room #104, P.A.B.
2:30 p. m.   Defendant waives *Miranda* rights, spoke to Detective Wade.
3:40 p. m.   Defendant rewarned by Det. Kane, was asked to take polygraph, consented.
4:00 p. m.   Defendant waiting for availability of polygraph machine and operator.
6:20 p. m.   Polygraph finally available, defendant took polygraph examination.
7:45 p. m.   Polygraph concluded, Det. Brady, polygraph operator, told Det. Kane that defendant untruthful in denying statement to Cooper about "busting someone in the ass".
7:55 p. m.   Det. Kane started statement, then left to verify gang names given by the defendant.
8:20 p. m.   Det. Strohm took over taking of statement, confessed to separate crime.
8:35 p. m.   Statement completed, Det. Kane returned for signing of statement.
8:50 p. m.   Det. Wisniewski, Northwest Detectives, arrives.
9:00 p. m.   Wisniewski warns defendant, takes statement.
9:50 p. m.   Arrive at Northwest Detectives after viewing crime scene on Rumford Road.
10:00 p. m.  Formal statement started.
10:50 p. m.  Formal statement concluded, signed.

November 19, 1975:
5:35 p. m.   Defendant arraigned.

had been beaten by the detectives (the latter was denied by the police). The suppression court found that he had not been beaten; and as to his withdrawal symptoms, it found that he was not so overwhelmed as to be unable to voluntarily and willingly give a statement. Such a finding, if the arrest were a legal one, would be sufficient. However, the mere absence of police coercion in an illegal arrest is not enough. As the Supreme Court stated in *Commonwealth v. Yocham*, 473 Pa. 445, 455, 375 A.2d 325, 330 (1977).

"In *Bishop*, we recognized that the confession might be 'truly voluntary' in the traditional sense but not free of all elements of coercion due to the unlawful arrest. Where it is determined that the detention is illegal and it is recognized that the illegal detention itself necessarily has a coercive quality regardless how scrupulously conducted, we would give no meaning to the Commonwealth's burden to establish that the statement was not a product of an exploitation of the illegality if we were to permit the burden to be satisfied merely by showing that the accused was not *mistreated* while he was being illegally detained. *Restated, if we were to test the voluntariness of the statement as if the arrest had been a legal one, we would be in fact ignoring the illegality.* As the United States Supreme Court in *Brown v. Illinois* [422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416] *supra*, indicated in these instances we are not only concerned with the fact that an accused may have been compelled against his will to incriminate himself, which is the landmark of the Fifth Amendment protection, but also unreasonable seizure of the person which is violative of the Fourth Amendment. [Footnote] Mere satisfaction of the requirements of the Fifth Amendment does not eradicate the violation of the Fourth Amendment."

[Emphasis in original]

We think it is clear that the Commonwealth has failed to sustain its burden of showing that the causal chain between the illegal arrest and the statements made subsequent thereto has been broken, so as to purge the primary taint. "The

prosecution's failure to meet its burden of proving that the appellant's oral statements were the product of causes other than the illegal detention, requires that the oral statements be suppressed. Their admission during the appellant's trial was reversible error." *Commonwealth v. Bailey*, 460 Pa. 498, 507, 333 A.2d 883, 887 (1975). We find it unnecessary therefore to consider the delay in arraignment contention.

Judgment of sentence reversed and a new trial awarded.

CERCONE, President Judge, concurs in the result.