## Rogan Estate.

Argued March 14, 1961. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Abraham Pervin,* with him *Sachs, Pervin, Kaufman & Menzer,* for appellant.

*Samuel Avins,* for appellees.

*Walter T. McGough* and *J. Tomlinson Fort,* with them *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY MR. JUSTICE EAGEN, June 2, 1961:
This is an appeal from a decree of the Orphans' Court of Allegheny County refusing to take off a compulsory nonsuit entered at the jury trial of a citation

to determine the ownership of the funds in a checking account.

The issue arose in the following manner. Michael D. Rogan died February 14, 1958. On the date of his death, there was on deposit in the Allegheny Trust Company of Pittsburgh the sum of $18,325.09 in a joint checking account in the names of the decedent and his daughter-in-law, Sheila P. Rogan. Within a matter of days following his death, Sheila P. Rogan withdrew the entire sum from the bank. The executor of the decedent's estate presented a petition to the orphans' court seeking a citation[1] against the Allegheny Trust Company, Sheila P. Rogan and her husband, to show cause why the money should not be turned over to the estate. Sheila Rogan claimed ownership of the money by reason of a gift inter vivos. After issue framed, a jury trial ensued. Upon the completion of the testimony offered by the executor of the estate, the trial judge ruled that the evidence established a prima facie gift of the funds in favor of Sheila P. Rogan, which had not been rebutted. A compulsory nonsuit was entered and the petition for the citation dismissed, which order the court en banc subsequently sustained.

The narrow but difficult question is, did the evidence establish a prima facie gift inter vivos to the decedent's daughter-in-law, Sheila P. Rogan?

The testimony offered by the estate is substantially as follows: On January 31, 1958, two weeks prior to the decedent's death, the money involved was in a checking account in his own name in the same trust company. On that date, the trust company transferred the money to another account, the one in dispute, a joint checking account in the names of the decedent and his daughter-in-law, Sheila P. Rogan. No check

---

[1] See, Act of August 10, 1951, P. L. 1163, §301, as amended, 20 PS §2080.301.

was signed by the decedent and delivered to the bank officials authorizing the withdrawal of the money from one account, and its transfer to the other, nor did the bank receive any oral authorization directly from the decedent to make the transfer. However, two identical bank checking account signature cards, purportedly signed by the decedent and Sheila P. Rogan, were delivered to the bank and were in its custody from the date of the transfer. These cards said in part: "The undersigned do hereby open a joint deposit account with The Allegheny Trust Company of Pittsburgh, and agree each with the other and with said Trust Company that all sums heretofore or hereafter deposited by either or both of said joint depositors, with said Trust Company *to their credit as such joint depositors,*[2] with all accumulations thereon, are and shall be owned by them jointly, with the right of survivorship, and be subject, in whole or in part, at any time and from time to time, during the life of both, to the check or order of withdrawal of both or either of them; and that upon the death of either the balance in said account shall belong to the survivor of them, and payment thereof to or on the check of the survivor shall be valid and discharge said Trust Company from all liability. Each of the undersigned appoints the other his or her Attorney-in-fact to endorse any check, draft, note, or other instrument payable to his or her order or to the order of both, and to deposit the same or any other moneys to said joint account."

Sheila P. Rogan, called as for cross-examination by the estate testified that, while the decedent was sick in the hospital, he suggested to her that she go to the bank and arrange the opening of a joint account; *that he further said such an arrangement would be more convenient for him in order that she could keep his*

---

[2] Emphasis throughout, ours.

*affairs current; that if anything happened to him he wanted her to have the money.* Upon the completion of this cross-examination, counsel for the trust company proceeded to then cross-examine the witness. Through a series of highly leading questions,[3] over the objection of counsel for the estate, he elicited the following: that the decedent, while in the hospital, indicated to the witness that he wished her to own part of the money in the bank; that, in accordance with his directions, she went to the bank and arranged the transfer of the money from the old account to the new joint account; that she informed an official of the bank of the decedent's wishes and instructions; that the bank gave her the joint account signature cards, with instructions as to their execution; that she took these cards to the hospital, read every word thereon to the decedent; that the latter knowingly and with full understanding signed the cards in four places, which (cards) she then returned to the bank.

Counsel for the estate contends that it was error for the court to permit the defendant-bank to introduce the defense, at this stage of the proceedings, under the guise of leading questions propounded by the bank's counsel to the other defendant, Sheila P. Rogan. The bank and Sheila P. Rogan had a strong mutual interest in defending against this citation. The defense to the estate's claim was the same as to both. If a valid gift were established, not only would the alleged donee be entitled to the money, but the bank might well be saved from an embarrassing situation. It was to the gain of both to have the claim of the estate rejected. Their interests were one and the same. To permit the bank

---

[3] While counsel for the estate did not persist in his objection to every question asked, he did offer strenuous objection immediately and clearly indicated his objection was basically to the bank's counsel putting in its defense through leading questions.

to put in the defense of both defendants through highly leading questions, under such circumstances, created an unfair situation and was clearly prejudicial. An example of these leading questions propounded by counsel for the bank discloses what happened: "Q. Didn't he tell you to go to the bank and get the cards so that the balance in his bank account could be transferred over and belong to you and him?

"Q. And you told him that your father-in-law had instructed you to have this money transferred over to a joint account so it would belong to both you and your father-in-law?

"Q. And did you tell Mr. Horst that your father-in-law wanted the money in his account, in his own name, to be transferred into this joint account?

"Q. And you said you explained it to him. Did you explain to him that that meant from the time this money was transferred, that money would belong to both you and him whether you were alive or dead?"

Of course, the answers were merely, "Yes."

When counsel for the estate concluded his examination of Sheila P. Rogan, as the case then stood, the question of whether or not a gift inter vivos had been established was a question for the jury.[4] The existence of the signature cards in the custody of the bank establishing the joint account, while prima facie evidence of a gift, did not preclude the introduction of other evidence to show no gift was actually intended: *Dempsey v. First Nat. Bk. of Scranton,* 359 Pa. 177, 58 A. 2d 14 (1948). However, the evidence to rebut the fact that a gift inter vivos was intended and effected must be clear, precise and convincing: *Amour Estate,* supra. It met this test. Up to this point in the testimony, it

---

[4] *Amour Estate,* 397 Pa. 262, 154 A. 2d 502 (1959) and *Furjanick Estate,* 375 Pa. 484, 100 A. 2d 85 (1953) are inapposite and clearly distinguishable in material facts.

had not been proven that the decedent had actually signed the cards. Admittedly, the decedent himself had never personally talked to an officer of the bank in regard to the new joint account, or the transfer of the funds from one account to another. The testimony of Sheila P. Rogan, herself, the alleged donee, given in response to questions submitted by counsel for the estate negatived the existence of the donative intent necessary to the establishment of a gift inter vivos. She, unequivocally, said that the joint account was established for the sake of convenience and *that it was the decedent's intention that she was to have the money upon his death.* This, in itself, clearly indicated that the decedent intended to continue control over, and ownership in, the money until his death. If any gift was proposed, it was upon his death and, as such, was testamentary in character. This is not a gift inter vivos. See, *Cochrane's Estate,* 342 Pa. 108, 111, 20 A. 2d 305 (1941), wherein this Court said: "The interests of joint tenants are equal. They own the half or part and the whole, per my et per tout. There is a unity of interest, title, time and possession. [citing cases] Even where one contributes the entire sum to a joint bank account, the rights of each of the tenants to the joint fund are the same, the one who made the contribution has by that act *made an immediate gift* to the other." In *King Estate,* 387 Pa. 119, 122, 126 A. 2d 463 (1956), this Court stated, one of the essential elements to constitute a valid gift inter vivos is *"An intention to make an immediate gift."* That this is the law of this Commonwealth, no one can question.

But say the defendants, the testimony of Sheila P. Rogan, given in response to questions submitted by the bank's counsel, clearly rebutted the implications of her testimony as related above and established conclusively the existence of a valid gift inter vivos. This, of course, is true if the examination, in question, were proper.

Under the circumstances presented, we conclude it was not.

Section 7 of the Act of May 23, 1887, P. L. 158, 28 PS 381, permits a litigant to call his adversary as for cross-examination, and expressly provides that "the adverse party calling such witnesses shall not be concluded by his testimony." This has repeatedly been construed to mean that, while the testimony thus obtained is not conclusive against the party calling the witness and may be rebutted by other proof, yet to the extent that it is not rebutted, it is conclusively taken to be true: *Krell v. Jacobson,* 314 Pa. 522, 172 Atl. 697 (1934). The question follows, if a party is called by his opponent as for cross-examination, what further examination of such witness may his own counsel then pursue? The cases hold that, as a general rule, the witness may be examined as to anything legitimately growing out of or related to matters inquired about in his cross-examination by the other party. He may be re-examined as to all matters tending to explain or qualify the testimony already given. See, *Corkery v. O'Neill,* 9 Pa. Superior Ct. 335 (1899); *The Scrantonian v. Brown,* 36 Pa. Superior Ct. 170 (1908); *Kline v. Kachmar,* 360 Pa. 396, 61 A. 2d 825 (1948). However, it has been held that it is proper for the trial court to deny the witness' counsel permission to examine him at this stage as to matters designed to introduce his main defense: *Corkery v. O'Neill,* supra; *Kline v. Kachmar,* supra. In fact, it is well established that a defendant should never be permitted to put in his defense under cover of cross-examination. See, *Greenfield v. Philadelphia,* 282 Pa. 344, 127 Atl. 768 (1925); *Agate v. Dunlevy,* 398 Pa. 26, 156 A. 2d 530 (1959). In *Hughes v. Westmoreland Coal Co.,* 104 Pa. 207, 213 (1883), this Court said, "to permit a party to lead out new matter, constituting his own case, under the guise of a cross-examination, is disorderly and often

unfair to the opposite party . . . ." As stated by Mr. Justice (now Chief Justice) JONES in *Kline v. Kachmar,* supra, at 404, "In determining the permissible scope of the examination of a party by his own counsel, when called to the witness stand by his adversary as for cross-examination, the courts have generally applied the rules relating to the cross-examination of a witness who is not a party to the record and who is produced for direct examination. In Jackson v. Litch, 62 Pa. 451, 455, Mr. Justice SHARSWOOD quoted with approval the statement in Helser v. McGrath, 52 Pa. 531, 533, that 'These rules, as well as all others on the order of examination of witnesses and the introduction of testimony, have for their object the eliciting of truth and the *preservation of the equality of the rights* of parties in trials in courts. Much, however, must still be left to the discretion of the judge. Neither the rule nor the exception must be allowed, if it can be prevented, *unduly to prejudice the parties. The exercise of a prudent discretion by the judge is the only guard against this in many cases.'* In Quigley v. Thompson, 211 Pa. 107, 109, 60 A. 506, it was said that,—'While the general principles applicable to the subject are clearly defined, it is in practice often difficult to determine the exact limits of proper cross-examination. Its range must of necessity rest largely in the discretion of the trial judge,' quoted with approval in Littieri v. Freda, 241 Pa. 21, 27, 88 A. 82; see also Glenn v. Philadelphia and West Chester Traction Company, 206 Pa. 135, 137, 55 A. 860; Thomas & Sons v. Loose, Seaman & Co., 114 Pa. 35, 47, 6 A. 326."

Undeniably, the rules of evidence have as their sole object the eliciting of the truth. To effectuate this result, it has long been held that one may not lead his own witness with suggestive questions. On the other hand, an adverse party may under cross-examination submit leading questions to the witness. The funda-

mental reason, underlying these principles, is that if the witness is friendly, or biased, in favor of the examiner, there is no need for suggestive questions and such interrogation may even lead to incorrect answers; however, if the witness is unfriendly to the cause of the examiner, he is not likely to accept or be influenced by the examiner's suggestions. Leading questions are, therefore, permissible in the latter instance to discredit or test the truthfulness of the direct testimony. See, 3 Wigmore, Evidence, §§773, 915 (3d ed. 1940). However, as stated by Professor Wigmore in the above authority, when the reason for these rules ceases to exist, so do the rules themselves, and if it develops in the trial of a case that the witness is in fact biased in favor of the cross-examiner, then leading questions are unfair and should not be permitted. Cross-examination presupposes the hostility of the witness. See also, 38 A.L.R. 2d 953, §3.

Under the facts this case presents, we conclude that the trial judge was guilty of a prejudicial abuse of discretion in permitting counsel for one of the defendants to introduce the defense, common to both, through leading questions directed to the other defendant who was, in fact, part and parcel of the same cause. The fact that it was counsel for a defendant, other than the party-defendant being interrogated, is of no moment. The substantialities of the situation must be considered, not mere technicalities.

The decree of the lower court is reversed and a new trial is ordered. Costs to abide the event.

Mr. Justice BELL dissents.