403 A.2d 521

COMMONWEALTH of Pennsylvania, Appellee,

v.

William HOSKINS, Appellant.

Supreme Court of Pennsylvania.

Argued April 17, 1979.

Decided July 5, 1979.

Reargument Denied July 31, 1979.

544

Joel Harvey Slomsky, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div. Asst. Dist. Atty., Stephen S. Seeling, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

On May 11, 1976, appellant, William Hoskins, was convicted by a jury in the Court of Common Pleas of Philadelphia of murder of the first degree, possessing instruments of a crime-generally,[1] possessing prohibited offensive weapons,[2] and criminal conspiracy. The convictions stem from the November 5, 1975 fatal shooting of Herschell Williams. Post-verdict motions were denied, and judgment of sentence of life imprisonment was imposed on the murder conviction. Judgments of sentence of not less than two and one-half to five years imprisonment and not less than five to ten years imprisonment were imposed on the weapons convictions and the criminal conspiracy conviction. The trial court directed these judgments of sentence to run concurrently with the judgment of sentence of life imprisonment. Hoskins appealed to this Court from the judgment of sentence imposed on the murder conviction. An appeal from the judgments of sentence on the remaining convictions was filed in the Superior Court and later certified to this Court.

Initially, Hoskins claims the evidence presented at trial is insufficient to support the convictions in this case. In evaluating the sufficiency of the evidence, the test is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Smith*, 484 Pa. 71, 398 A.2d 948 (1979); *Commonwealth v. Santiago*, 476 Pa. 340, 382 A.2d 1200 (1978); *Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 (1977); *Commonwealth v. Robinson*, 468 Pa. 575, 364 A.2d 665 (1976). The Commonwealth

1. 18 Pa.C.S.A. § 907(a).

2. 18 Pa.C.S.A. § 908.

may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Dawson*, 464 Pa. 254, 346 A.2d 545 (1975); *Commonwealth v. Alston*, 461 Pa. 664, 337 A.2d 597 (1975). Moreover, in applying the above test, the entire trial record must be evaluated and all evidence actually received must be considered, whether or not the trial court's rulings thereon were correct. *Commonwealth v. Boyd*, 463 Pa. 343, 344 A.2d 864 (1975); *Commonwealth v. Tabb*, 417 Pa. 13, 207 A.2d 884 (1965). Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part, or none of the evidence. *Commonwealth v. Murray*, 460 Pa. 605, 334 A.2d 255 (1975).

■ Viewed in this light, the record reveals the following:

At approximately 10:15 a. m. on November 5, 1975, Hoskins, who was driving a 1975 Cadillac automobile, arrived at the home of Lonnie Dawson. Dawson exited his home and entered the automobile. The automobile, which was green in color, was owned by Hoskins' friend and employer, Calvin Tilghman. Tilghman lent the automobile to Hoskins on the previous day and did not recover possession of the automobile until after Hoskins was arrested for the crimes involved instantly.[3]

At approximately 12:15 p. m., a green Cadillac, occupied by three males, was parked at the intersection of Roumfort Road and Bayard Street in Philadelphia. This intersection borders the 8600 block of Bayard Street. The automobile was positioned diagonally across Roumfort Road in a man-

---

3. At trial, Tilghman testified that he lent the automobile to Hoskins on November 4, 1975, the day before the fatal shooting; that, when he lent Hoskins the automobile, there were no guns in the Cadillac; that, at approximately 8:00 a. m. on November 5, 1975, he saw the Cadillac in front of Hoskins' mother's house in the South Philadelphia section of the city; that, between November 4, 1975 and November 5, 1975, Hoskins never returned the keys to the automobile; that, between November 4, 1975 and the time he regained possession of the automobile, he did not lend the Cadillac to anyone else; and, that he did not regain possession of the automobile until after Hoskins was arrested on November 5, 1975.

ner that prevented the normal flow of traffic on that road. Hoskins was the driver of this automobile.

Sometime between 12:20 p. m. and 12:30 p. m., a 1975 green Cadillac was parked and was partially blocking a driveway which runs behind and parallel to the 8600 block of Bayard Street. A male occupied the driver's seat of the automobile. Hoskins, who was wearing a brown suit, a matching brown wide-brimmed hat, and sunglasses, was standing on the corner of Bayard Street and Roumfort Road. Another male, wearing a print shirt and brown "jeff" cap, was seated on the steps leading to 8605 Bayard Street. A few minutes later, Hoskins joined the male sitting on the steps and asked Frederick Robb, who was exiting his home located at 8603 Bayard Street, for the correct time. Robb, who testified at trial, informed Hoskins that he "didn't know" the time and left the vicinity of Bayard Street and Roumfort Road in an automobile driven by a friend, Daniel Parks.[4]

Subsequently, a male wearing a "brown habit," i. e. brown pants, brown jacket, brown shoes and brown hat, and sunglasses, was sitting on the steps leading to a house located on Bayard Street near Ivyhill Road. This person was holding a bucket and a handkerchief or rag which he ultimately waved in the direction of Ivyhill Road. As the male in the "brown habit" waved the handkerchief or rag, the victim, Herschell Williams, accompanied by his two children, exited his home which was located on Bayard Street near Ivyhill Road.

4. At trial, the unequivocal testimony of both Robb and Parks was that Hoskins was the male in the brown suit, wide-brimmed hat, and sunglasses. Furthermore, Robb testified that both he and Parks left the vicinity of Bayard Street and Roumfort Road in order to bring some clothes to a nearby cleaners; that they immediately returned to the vicinity of Bayard Street and Roumfort Road; that, upon returning from the cleaners, he noticed Hoskins and the other male, who had been seated on the steps leading to 8605 Bayard Street, had moved up Bayard Street toward Ivyhill Road; and, that he noticed the 1975 green Cadillac had been moved to another position on Roumfort Road.

The male in the "brown habit" walked up Bayard Street toward Ivyhill Road. Another male, wearing a brown "jeff" cap, turned the corner of Ivyhill Road and walked down Bayard Street toward Roumfort Road. Both males [5] fired numerous gunshots at Williams. After fatally wounding [6] Williams, both males ran down Bayard Street toward Roumfort Road.

At approximately 1:07 p. m., the Philadelphia police spotted a 1975 dark green Cadillac in an eastbound lane of the Schuylkill Expressway just west of Montgomery Drive. As a result of information received at the scene of the fatal shooting, the police stopped the automobile in the vicinity of

5. At trial, no Commonwealth witness identified Hoskins as one of the two males who fired the gunshots at Williams. However, Sharon Johnson testified one of the males carried a yellow bucket, and this man with the bucket approached the victim by walking up Bayard Street toward Ivyhill Road.

Furthermore, a Commonwealth witness, Robert Brown, testified that, at about 12:30 p. m., he was exiting a friend's house located at 8647 Bayard Street; that he saw a man dressed in a brown outfit sitting on the steps in the vicinity of 8642 Bayard Street; that the male in the brown outfit held a bucket and handkerchief or rag; that, as the male in the brown outfit waived the handkerchief or rag, a man with two children exited a house located about three doors from the corner of Bayard Street and Ivyhill Road; that he heard what sounded like gunshots; that, as his friend attempted to operate the automobile they had entered, two men ran in front of the car; that one man was the man dressed in the brown outfit; that he could not see the face of the man dressed in the brown outfit because of the man's hat and sunglasses; and, that the other male who darted in front of the car wore a brown "jeff" cap.

Brown's description of the man dressed in the brown outfit and carrying the bucket is strikingly similar to the description of Hoskins offered by Robb and Parks.

6. Doctor Robert L. Catherman, Deputy Medical Examiner for the City of Philadelphia, who conducted an autopsy of the victim, testified that there were some thirteen gunshot wounds on the victim's body; that five projectiles remained in the victim's body; that six of the wounds indicated they were inflicted from within nine to eighteen inches of the body; that only .32 caliber projectiles were recovered from the body; that the cause of death was multiple gunshot wounds; and, that, in his opinion, at least one of the wounds was not consistent with a .32 caliber projectile, but was consistent with a higher velocity weapon, namely, a .357 magnum revolver.

the Spring Garden Street exit of the expressway.[7] The occupants of the automobile, Hoskins, Lonnie Dawson, and Joseph Rhone, were placed under arrest. When arrested, Hoskins, who was seated in the front passenger seat, was wearing a brown suit, wide-brimmed hat, and sunglasses. The male occupying the rear seat wore a "jeff" cap.

The 1975 Cadillac was searched pursuant to a search warrant. The police recovered two loaded revolvers which were hidden under the dashboard approximately three to four inches to the left of the glove compartment. The police also searched the immediate vicinity of Bayard Street and Roumfort Road. Eventually, they recovered two weapons from a sewer located on the southeast corner of Roumfort Road and Cheltenham Avenue. One of the weapons was a .32–20 revolver and the other was a .357 magnum revolver. Both contained six fired cartridges.

Subsequently, a firearms examiner, employed by the Philadelphia Police Ballistics Laboratory, conducted an examination of the physical evidence involved in this case. The results of this examination showed that the projectiles removed from the victim's body were fired by the .32–20 revolver recovered from the sewer; that the spent cartridges found in the .357 magnum revolver recovered from the sewer were fired by that weapon;[8] and, that both of the revolvers found in the Cadillac were operable.

At trial Hoskins relied on an alibi defense, namely, that he was in another section of the city at approximately 12:15 p. m. on November 5, 1975, and could not, therefore, have been one of the individuals who fatally wounded Williams. In

7. We note that, on November 7, 1975, Detective Andrew Stephens of the Philadelphia Police Department drove his patrol car from the vicinity of the shooting to the spot where Hoskins was arrested. This trip began at approximately 12:48 p. m. and ended at 1:06 p. m. Throughout the trip, the detective attempted to travel at the posted speed limit.

8. The only projectiles recovered from the victim's body were five .32 caliber projectiles. Therefore, there were no projectiles removed from the victim's body which could be compared to the .357 magnum revolver. However, see the testimony of Doctor Catherman accounted at n. 6, supra.

support of this theory, Hoskins presented the testimony of Rene Williams, the victim's sister. Miss Williams testified that Hoskins was a friend of her brother; that, between 12:15 p. m. and 12:25 p. m. on November 5, she saw Hoskins at 41 South 40th Street in the West Philadelphia section of the city; and, that she did not remember seeing a green Cadillac. However, Miss Williams also admitted she learned Hoskins was a suspect in her brother's fatal shooting on November 6, 1975, but never revealed she saw Hoskins on 40th Street until one and one-half weeks prior to trial.

Hoskins took the stand in his own defense. He testified that, at approximately 11:30 a. m. on November 5, 1975, he arrived in West Philadelphia; that, at approximately 12:15 p. m., he saw Rene Williams at 41 South 40th Street; that he did not drive Tilghman's Cadillac on November 5, 1975; that he borrowed Tilghman's automobile during the week of the shooting, but returned the keys prior to November 5; that he did not drive the automobile to Dawson's home on the morning of the shooting; that Dawson also worked for Tilghman; that he saw Dawson in West Philadelphia driving the Cadillac on the day of the shooting; and, that Dawson agreed to drive him from West Philadelphia to his home.

The preceding evidence, both direct and circumstantial, when considered in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, is sufficient to support the convictions of murder of the first degree, possessing instruments of a crime-generally, and criminal conspiracy. However, the evidence does not support a conviction of possessing prohibited offensive weapons.

■ The crime of possessing prohibited offensive weapons is defined at 18 Pa.C.S.A. § 908. Subsection (c) of that section reads:

"Definition—As used in this section 'offensive weapon' means any bomb, grenade, machine gun, sawed-off shotgun, firearm specially made or specially adapted for concealment or silent discharge, any blackjack, sandbag,

metal knuckles, dagger, knife, razor or cutting instrument, the blade of which is exposed in an automatic way by switch, push-button, spring mechanism, or otherwise, or other implement for the infliction of serious bodily injury which serves no common lawful purpose."

Clearly, the revolvers involved instantly are not specifically enumerated in the definition of an offensive weapon. Therefore, in order to sustain the conviction of possessing prohibited offensive weapons, we must conclude the revolvers are "other implement[s] for the infliction of serious bodily injury which [serve] no common lawful purpose." Such a conclusion is unwarranted. See *Commonwealth v. Fisher,* 485 Pa. 8, 400 A.2d 1284 (1979). See also *Commonwealth v. McHarris,* 246 Pa.Super. 488, 371 A.2d 941 (1977). Hence, the judgment of sentence imposed on the conviction of possessing prohibited offensive weapons must be reversed and the charge dismissed.

In addition to his claim that the evidence was insufficient to support the convictions, Hoskins urges he was deprived of a fair trial by conduct pursued by the assistant district attorney during the trial. We agree and reverse.[9]

Specifically, Hoskins complains that numerous times throughout the cross-examination of Hoskins and Rene Williams, the assistant district attorney posed improper and inflammatory leading questions concerning "drug trafficking" and the "Muslim" religion.[10] One of the leading ques-

---

**9.** Hoskins advances various other claims which seek the grant of a new trial. In view of our decision, we will not discuss the following claims: (1) that trial counsel was ineffective for failing to submit jury instructions on the issue of eyewitness identification; (2) that trial counsel was ineffective for failing to object to prejudicial remarks made by the assistant district attorney during his summation to the jury; and, (3) that Hoskins' rights under the Fifth and Fourteenth Amendments were violated when a Commonwealth witness informed the jury that Hoskins gave an inculpatory statement which had previously been ordered suppressed by the trial judge.

**10.** We cannot ignore the fact that certain adherents of the Muslim faith known as "Black Muslims" have been the subject of widespread unfavorable publicity, primarily because of some of its follower's involvement in criminal activity. See *e. g., Commonwealth v.*

tions, which is the subject of complaint, was posed by the assistant district attorney during the cross-examination of Hoskins. The relevant portion of the record is this:

"Q. You know Robert Blair, don't you, her common-law husband?

"[Defense Attorney]: Objection, Your Honor.

"The Court: Overruled.

"Q. You know Robert Blair, don't you?

"A. I know Blair.

"Q. That's Rene Williams' common-law husband, right?

"A. I don't know.

"Q. You never saw them together?

"A. Yes, I have saw them together.

"Q. *And you know that Robert Blair is in the drug business, don't you? Don't you?*

"A. No, I don't.

"[Defense Attorney]: Objection.

"The Court: Yes.

"[Defense Attorney]: I move that be stricken and move for a mistrial.

"The Court: Objection sustained.

"[Assistant District Attorney]: Judge—

"[Defense Attorney]: I move for a mistrial.

"The Court: Objection sustained. It shall be stricken. The jury will disregard it." [Emphasis added.]

We acknowledge the above emphasized question is not necessarily an improper and inflammatory leading question on its face. However, the improper and inflammatory inference suggested by this question become apparent when the question is considered in the context of the factual circumstances preceding the request for a mistrial.

■ Prior to defense counsel's motion for a mistrial, the assistant district attorney asked Miss Williams whether her

mother was presently selling drugs; whether the victim told her the "Muslims" were looking for him; whether the victim sold drugs from his house; whether the victim wore a bullet-proof vest; whether she belonged to the "Muslims" as did the victim; and, whether the victim was in fact a "Muslim." Furthermore, during the cross-examination of Hoskins, the assistant district attorney asked several questions concerning his involvement with the "Muslim" religion.[11] Objection to all of these questions were entered and several of the objections were sustained.[12]

11. The relevant portions of this line of questioning are as follows:
"[Assistant District Attorney]: Good afternoon, Mr. Hoskins. Mr. Hoskins, would you tell this jury if you know a man by the name of Lt. Muhammad Walida?
"[Defense Attorney]: Objection.
"A. Who?
"[Assistant District Attorney]: Do you know a man by that name?
"[Defense Attorney]: Objection.
"The Court: You have to show me the relevancy, council.
"[Assistant District Attorney]: *It's him, Judge.*
"[Assistant District Attorney]: Do you know a man by the name of Lt. Muhammad Walida?
"The Court: Were you known by that name?
"The Defendant: Not by that name.
"[Assistant District Attorney]: What name were you known by?
"[Defense Attorney]: Objection. What does___
"The Court: Overruled. You still have to show some relevancy. You can move to strike it later if it is shown.
    You may answer the question.
"[Assistant District Attorney]: What name are you known by?
"A. Muhammad Walida.
"[Assistant District Attorney]: *I'm sorry. Lieutenant, right?*
"A. No.
"[Assistant District Attorney]: *And you belong to Temple Twelve?*
"[Defense Attorney]: I'm going to renew my objection.
"[Assistant District Attorney]: *Mr. Williams belonged to Temple Twelve. That's relevant.*
"The Court: Overruled, for the moment. However, you may re-make your objection—
"[Defense Attorney]: Thank you.
"The Court: —if there is no relevancy and you can move to strike it, counsel.
    I will let him answer the question.
"[Assistant District Attorney]: You belong to Temple Twelve, don't you?
"A. Yes, sir.

12. See note 12 on page 554.

■ The assistant district attorney posed the preceding leading questions even though the Commonwealth's case-in-chief did not even intimate that "drug trafficking" and the "Muslim" religion were relevant issues in this case.[13] Fur-

> "[Assistant District Attorney]: And how many people belong to Temple Twelve?
>
> "[Defense Attorney]: Objection.
>
> "The Court: Yes. I will sustain the objection as to how many people.
>
> "[Assistant District Attorney]: You're a Muslim. Temple Twelve is from The Nation of Islam; isn't that correct?
>
> "A. That's right.
>
> "[Defense Attorney]: What religion?
>
> "The Court: Just make your objection.
>
> "[Defense Attorney]: Objection.
>
> "The Court: I am overruling it at this time. If he does not show the relevancy, remake your objection after he has finished this line of questioning and at that time if it is not relevant I am going to sustain your motion." [Emphasis added.]
>
> The assistant district attorney never did show the relevance of these leading questions, and ultimately the trial court instructed the jury to disregard this line of questioning.

12. The Commonwealth argues, since several of the objections to the questions were sustained, any further complaint regarding these questions is waived. The basis of this argument is that, since Hoskins failed to do anything more than object and request the striking of testimony in some instances, he received all the relief requested and cannot now seek further relief. See *Commonwealth v. Hill,* 479 Pa. 346, 388 A.2d 689 (1978); *Commonwealth v. Brown,* 467 Pa. 512, 359 A.2d 393 (1976); *Commonwealth v. Maloney,* 469 Pa. 342, 365 A.2d 1237 (1976); *Commonwealth v. Glenn,* 459 Pa. 545, 330 A.2d 535 (1974). We agree that, as an independent basis for relief, any complaint regarding these questions for which no further relief was requested must be considered waived, and we do not question the continued validity of our decisions in *Hill,* supra; *Brown,* supra; *Maloney*; supra, and *Glenn,* supra. We consider these questions for the limited purposes of determining: (1) whether the leading question which prompted the mistrial request, when considered in the factual context presented at trial, suggested any improper and inflammatory inferences; and, (2) whether the "atmosphere of the trial" was such that the "unavailable effect" of any improper and inflammatory inferences was to prevent an objective verdict by the jury. See *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975).

13. The Commonwealth also presented the testimony of two witnesses as rebuttal evidence. However, at no time during the direct or redirect testimony of these witnesses was any effort made by the assistant district attorney to show the relevance of the cross-examination questions concerning "drug trafficking" and the "Muslim" religion.

ther, this type of cross-examination was pursued after the following facts were elicited at trial: (1) Miss Williams, the only alibi witness, had a very close relationship with her brother; (2) Hoskins and the victim were close friends for approximately four years; (3) Hoskins knew Blair; (4) Blair was the alleged common-law husband of Miss Williams; and, (5) prior to November 5, 1975, Miss Williams was acquainted with Hoskins. Thus, the leading question regarding the drug activities of Robert Blair, the alleged common-law husband of Hoskins' *only* alibi witness, was the culmination of a strategy calculated to try the instant case on issues not properly before the jury. When viewed in the factual context present at trial, the question, which resulted in the mistrial request, suggested to the jury that, through their association with Blair, the victim, and Williams' mother, Hoskins and his only alibi witness, Miss Williams, were both involved in drug trafficking. Furthermore, this inference of illegal drug trafficking on the part of Hoskins and his only alibi witness was coupled with the suggestion that Hoskins, Miss Williams, and the victim were all associated with a religion which had a reputation for criminal activity.[14] Such inferences are clearly improper and inflammatory.

We acknowledge that every improper and inflammatory leading question by a district attorney does not necessarily require a new trial. *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975). Furthermore, the trial court has discretion in granting a mistrial, and instructions to the jury to disregard an improper and inflammatory question are adequate in many instances. However, we also acknowledge the effect of an improper and inflammatory leading question posed by a prosecutor "depends upon the atmosphere of the trial." See *Stoltzfus,* supra.

After reviewing the instant trial record up until the question which resulted in the mistrial request,[15] see e. g., *Commonwealth v. Perillo,* 474 Pa. 63, 376 A.2d 635 (1977), we

14. See n. 10, supra. See also n. 13, supra, regarding the failure of the Commonwealth to establish the relevance of these questions.

15. See footnote 12, supra.

conclude the "atmosphere of the trial" was such that the "unavoidable effect" of the improper and inflammatory leading question pertaining to Blair's drug activities was to form in the minds of the jury bias and hostility toward Hoskins and thus prevent an objective verdict. We must, therefore, conclude that the trial court abused its discretion in not granting a mistrial. The "only appropriate relief" given the "atmosphere of the trial" and the prejudicial nature of the assistant district attorney's leading question was for the court to have declared a mistrial.[16] See *Commonwealth v. Potter*, 445 Pa. 284, 285 A.2d 492 (1971).

The judgment of sentence imposed on the offense of possessing prohibited offensive weapons is reversed and the charge is dismissed. The judgments of sentence imposed on the conviction of murder, conspiracy and possessing instruments of a crime-generally are reversed, and as to these charges a new trial is granted.

MANDERINO, J., did not participate in the consideration or decision of this case.

ROBERTS, J., joins in this opinion and filed a concurring opinion.

LARSEN, J., concurs in the result.

NIX, J., filed a concurring and dissenting opinion.

NIX, Justice, concurring and dissenting.

I agree with the majority's disposition of appellant's sufficiency of the evidence claim and join in the conclusion that the evidence does not support a conviction of possessing prohibited offensive weapons as defined in 18 Pa.C.S.A. § 908. I do not share the view of my brethren that a new trial should be allowed on those charges for which the

16. We note that our decision today is not intended to curtail the normal use of leading questions during cross-examination. However, we do condemn the use of improper and inflammatory leading questions to inject issues into a case which have no bearing on the guilt or innocence of a defendant, but only instill in the minds of the jury bias and hostility toward a defendant.

Commonwealth did provide sufficient evidence to establish guilt.

The specific reason assigned for the reversal was a series of questions by the assistant district attorney addressed to the defendant relating to an individual by the name of Robert Blair.[1] Robert Blair was allegedly a romantic partner of Rene Williams, the alibi witness for the defense. Ms. Williams was the sister of the victim, thus her testimony for the defense, on its face, could have been most compelling. It was therefore incumbent upon the prosecution to establish a basis for challenging her credibility. While the Commonwealth's attorney's attempt to attack this witness's testimony may have been inartfully done, I do not believe it constituted the type of grievous error that would necessitate a new trial.

The prosecuting attorney asked the witness, "And you know that Robert Blair is in the drug business, don't you? Don't you?" In response the appellant replied, *"No, I don't."* Although I would agree that it was naive for counsel to believe that he could establish this fact from that witness in this manner, any purported harm was negated by the court's ruling sustaining the objection to the question and instructing the jury to disregard the question and answer.[2] Under the circumstances, I do not believe that this series of ques-

1. The majority opinion seeks an unwarranted inference from the fact that these inquiries were posed as "leading questions". It is entirely proper for questions on cross-examination to be so framed. Accordingly, it is well settled that on cross-examination of an opponent's witness, ordinarily no question can be improper as "leading". III Wigmore, Evidence, § 773 (3d ed. 1940). *See* Fed.R.Ev. 611(c). *Cf. Rogan Estate,* 404 Pa. 205, 214, 171 A.2d 177, 181 (1961) (civil case; leading questions may be asked of opponent's witness on cross-examination).

2. The majority emphasizes that the prosecution had not established as a motive for the killing "drug trafficking" in their case in chief. Here the majority exposes its naivete in failing to comprehend the difficulty in establishing such a fact. According to the Commonwealth, this was a planned execution and therefore there was a reason for the decision that the victim should have been killed. Under our law the prosecution need not establish motive, yet this fact does not prevent it from introducing motive from whatever source it can do so.

tions and responses had the "unavoidable effect" of prejudicing the jury and preventing an objective verdict based upon the properly admitted evidence. *See Commonwealth v. Joyner,* 469 Pa. 333, 365 A.2d 1233 (1976); *Commonwealth v. Goosby,* 450 Pa. 609, 301 A.2d 673 (1973); *Commonwealth v. Simon,* 432 Pa. 386, 248 A.2d 289 (1968).

Recognizing the weakness of it's position, the Majority attempts to bolster its view by suggesting that the references to appellant's religious affiliations should be considered in weighing the prejudice of this testimony. Any person in this state and in this nation is constitutionally guaranteed the freedom of selecting the religious belief of his or her choice. *See* U.S.C.A.Const., Amend. 1; Pa.Const., art. 1, § 3. This is a fundamental tenet of this nation and any attempt to undermine it cannot be condoned. Thus when one requests that a mistrial should be declared where the prosecution improperly uses a religious affiliation as a basis for attacking the credibility of a witness who is a member of the particular faith or sect identified, that request should be granted. *Commonwealth v. Mimms,* 477 Pa. 553, 385 A.2d 334 (1978).[3]

However, unlike the situation presented in *Mimms,* here the court sustained the objections to this questioning and the defense's request to strike the testimony was granted. There was no application for the withdrawal of a juror in reference to this complaint, therefore appellant is not entitled to a relief which he did not seek. *Commonwealth v. Hill,* 479 Pa. 346, 388 A.2d 689 (1978); *Commonwealth v. Brown,* 467 Pa. 512, 359 A.2d 393 (1976); *Commonwealth v. Maloney,* 469 Pa. 342, 365 A.2d 1237 (1976); *Commonwealth v. Glenn,* 459 Pa. 545, 330 A.2d 535 (1974). Nor should the unrequested relief be given under the subterfuge of evaluating an unrelated claim by finding a cumulative effect which requires reversal. I therefore dissent from that part of the mandate which reverses the judgment of conviction of mur-

3. In the *Mimms* case this writer was the first to identify the Commonwealth's error in referring to the defendant's Muslim faith. *Commonwealth v. Mimms,* 471 Pa. 546, 553; 370 A.2d 1157, 1161 (1977) (concurring opinion of Nix, J., joined by O'Brien, J.)

der of the first degree, possessing instruments of crime—generally, and criminal conspiracy and awards a new trial.

ROBERTS, Justice, concurring.

I join in the Opinion of the Court. "The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. *Blumenthal v. United States,* 332 U.S. 539, 559, 68 S.Ct. 248, 257, 92 L.Ed. 154, all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., joined by Frankfurter & Murphy, JJ., concurring). This case amply demonstrates that what Justice Jackson said in 1949 applies today, thirty years later, with full force.