468 A.2d 1078

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Louis P. DiNICOLA, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 12, 1983.

Decided Dec. 6, 1983.

Reargument Denied Feb. 6, 1984.

Ramsey Clark, Pro Hac Vice, Lawrence W. Schilling, New York City, Thomas M. Kerr, Titus, Marcus & Shapira, Pittsburgh, for appellant.

Michael J. Veshecco, Dist. Atty., Erie, Bernard Siegel, Sp. Asst. Dist. Atty., Philadelphia, for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Louis DiNicola was convicted of arson and three counts of second degree murder by a jury sitting in the Court of Common Pleas of Erie County, and on February 27, 1981 he was sentenced to three consecutive sentences of life imprisonment. After post-verdict motions were filed and denied, an appeal was taken, and on November 30, 1982 Superior Court, 308 Pa.Superior Ct. 535, 454 A.2d 1027, affirmed the judgment of sentence. Petition for allowance of appeal to this Court was filed and we granted allocatur. For the reasons that follow, we vacate the judgment of sentence and remand for a new trial.

On the afternoon of August 30, 1979 DiNicola and a friend, Jefferson, walked from their work at McCreary Roofing in Erie, Pennsylvania to Jefferson's house, where they drank beer, smoked marijuana, and worked on Jefferson's truck. While they were working on the truck, Deborah Sweet, a new tenant who lived on the first floor of the same building in which Jefferson lived, introduced herself to the two men and invited them in for beer. The three talked, drank beer and smoked marijuana in the kitchen of Ms. Sweet's apartment until about 9:00 p.m., when Ms. Sweet put her two children, aged four and eight, to bed. DiNicola made a sexual advance to Ms. Sweet in the kitchen, but was rebuffed. Thereafter, Jefferson took a shower and changed into fresh clothes and later DiNicola took a bath in Ms. Sweet's apartment. Both men were very dirty from their work. While DiNicola was bathing, sometime around 11:00 p.m., Jefferson and Ms. Sweet entered her bedroom, and with the door open, began having sex. When DiNicola emerged from the bathroom, Ms. Sweet testified

that he paused in the bedroom doorway, saw that she and Jefferson were engaged in sex, and walked into the front part of the apartment, where she heard him open the door to her daughter's room. She then heard footsteps retreat from that area, enter the kitchen, and exit through the kitchen door, which was only operable door in the apartment. She also heard that the kitchen door did not close tightly.

Ms. Sweet then dozed and was awakened by the sound of someone in the kitchen, which was adjacent to her bedroom. She thought it might be one of her children, and listened intently, and the footsteps went from the kitchen to the front part of the house. She testified, "[T]hen I heard this noise. Suddenly, there was smoke pouring over my ceiling...." N.T. 67. She ran from her bedroom into the kitchen and saw DiNicola standing in the other doorway leading from the kitchen to the front part of the house, "staring at the fire," N.T. 68, which was then burning in the front part of the house where her children's rooms were located. The three adults ran from the house through the kitchen door and Ms. Sweet's subsequent attempts to reach her children were unavailing. Both children and a man who lived on the second floor died in the fire. The Erie Fire Department received the alarm shortly after midnight.

■ DiNicola's first allegation of error is that the evidence was insufficient to support the verdict. "It is well established that the test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt." *Commonwealth v. Keblitis*, 500 Pa. 321, 323, 456 A.2d 149, 150 (1983). Since the convictions were for arson and second degree murder, the Commonwealth was required to establish (1) there was a fire of incendiary origin, (2) persons were recklessly placed in danger of death or bodily injury, (3) the

defendant set the fire, (4) the fire caused the deaths of the three victims.[1]

As to the incendiary origin of the fire, two Pennsylvania State Police Fire Marshals testified that they examined the scene of the fire and determined from the appearance of burn marks and from reports on materials which they took from the building and submitted to the State Police Crime Laboratory, (segments of the floor and other burned materials) that the fire was of incendiary origin. Moreover, all of the firemen who entered the building reported a strange acrid odor on the second floor which stung their eyes and made it hard to breathe. The Fire Chief reported a strong "kerosene-type" odor when he entered the building on the first floor. The laboratory report established that a fluid similar to Stoddard solvent, a kerosene class product which burns at a steady rate, as opposed to smoldering, was used as an accelerant in the fire. It had been poured in two adjacent rooms, the living room and the den, on the floor, on books which were being stored in a carton, and on the stereo cabinet. Moreover, the fire marshals testified that even if the laboratory report had been negative for an accelerant, the burn patterns, which they observed and photographed after removing the debris from the burned building, indicated that an accelerant was used to ignite the fire. They testified further that their

1. The sections of the Crimes Code relevant to this case are:
   § 3301. **Arson and related offenses**
   (a) **Arson endangering persons.—**
   (1) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, whether on his own property or on that of another, and thereby recklessly places another person in danger of death or bodily injury.
   Act of 6 December 1972, P.L. 1482, No. 334, § 1, eff. June 6, 1973, 18 Pa.C.S.A. 3301(a) (1973).
   § 2502. **Murder**
       *    *    *    *    *    *
   (b) **Murder of the second degree.—**A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.
   Act of 26 March 1974, P.L. 213, No. 46, § 4, as amended, 18 Pa.C.S.A. § 2502.

investigation ruled out an electrical origin for the fire, and it was stipulated that there was no gas leak. Although DiNicola argues that lighted candles which were burning may have started the fire, such an origin would not explain the fire marshals' finding that an accelerant was used to kindle the fire. Thus, there was clearly sufficient evidence upon which the jury could have determined that the fire was of incendiary origin.

Item 2, that the fire was set with disregard for the safety of others, and item 4, that three persons died as a result of the fire, were also established by sufficient evidence. DiNicola was aware that both floors of the dwelling were occupied (his friend Jefferson lived with his mother and her fiance on the second floor) and that at least two adults besides himself and two children were present in the first floor. It was stipulated that the three deaths were caused by the fire.

Remaining at issue is item 3, that DiNicola set the fire. Evidence of DiNicola's culpability includes the following: (1) Ms. Sweet saw DiNicola standing in the door of her room while she was having sex with Jefferson and she heard footsteps as he walked through the apartment, opened the door to her daughter's bedroom, and then left through the kitchen door, which was the only operable door in the apartment. Although Ms. Sweet closed the doors to the rooms of both children when she put them to bed, when firemen entered the building, they found the door to Ms. Sweet's daughter's room open and the child's body on the bed. (2) Subsequently, Ms. Sweet dozed and was awakened by the sound of someone moving around in the kitchen. The footsteps then left the kitchen and proceeded to the front part of the house. Ms. Sweet then heard an unidentified sound and saw smoke. *She heard no footsteps retreating from the front of the house,* and when she jumped from bed to the door of her room, she saw DiNicola standing in the other doorway leading from the kitchen, staring at the fire in the front of the house. (3) The fire was started with an accelerant similar to Stoddard solvent,

which DiNicola had access to at his place of employment. (4) DiNicola's suggestion that an unknown intruder could have started the fire would require that the jury believe the intruder, without being detected, splashed an accelerant in two rooms, including the room measuring roughly 12' × 11', where DiNicola told police he was sleeping on a couch, and ran from the house without being heard. (5) The presence of the accelerant is consistent with DiNicola's anger because of Ms. Sweet's earlier rebuff of his sexual advances. This evidence, although not overwhelming, is sufficient to establish beyond a reasonable doubt that DiNicola was responsible for the fire. That the evidence is circumstantial is of no moment, for as we have observed, proof of guilt, "especially in arson cases," may be established by circumstantial evidence. *Commonwealth v. Nasuti*, 385 Pa. 436, 444, 123 A.2d 435, 438 (1956). We conclude, therefore, that all of the elements of the crime were reasonably established by sufficient evidence beyond a reasonable doubt, and this claim of error is denied.

■ Appellant next claims, however, that it was error of the trial court to admit testimony of a police officer, educed by the Commonwealth, as follows:

Q. Now Detective DiPaolo, on October the 2nd, 1979, while you were present in this conversation with the defendant and in the presence of Assistant District Attorney Shad Connelly, did the defendant direct a question to Mr. Connelly in your presence?

A. Yes, sir, he did.

Q. What was the question?

A. The defendant asked him at this time, what did he think about this case.

Q. And in your presence and hearing did the Assistant District Attorney Connelly respond?

A. Yes, sir.

Q. What was his response?

A. He said, "yes, *I think you did it.*"

The statement, "I think you did it" is irrelevant to any issue in the case, is hearsay not falling within any exception to the hearsay rule,[2] and is merely the opinion of an assistant district attorney. We have consistently held that a prosecutor may not offer his personal opinion as to the guilt of the accused either in argument or in testimony from the witness stand. *Commonwealth v. Russell,* 456 Pa. 559, 562–63, 322 A.2d 127, 129 (1974); *Commonwealth v. Cronin,* 464 Pa. 138, 142–43, 346 A.2d 59, 61–62 (1975); *Commonwealth v. Pfaff,* 477 Pa. 461, 470, 384 A.2d 1179, 1182–84 (1978); *Commonwealth v. Kuebler,* 484 Pa. 358, 363, 399 A.2d 116, 119 (1979); *Commonwealth v. Smith,* 490 Pa.

---

2. Because of our disposition of the case, we need not discuss at length the relevancy and hearsay aspects of this testimony, except to note that the Commonwealth offered no rationale for the admission of the statement and that the trial court failed to recognize the inadmissibility of the statement, even when it was pointed out by defense counsel:

Q [by the prosecutor]. What was the question [asked by the defendant] and the remark [made by the assistant district attorney]?

DEFENSE COUNSEL. That's objected to, Your Honor, and if I can see you at side bar, you will understand why.

JUDGE. Okay.

[Following discussion took place at sidebar]

DEFENSE COUNSEL. Let me show you the question and the remark. I assume that's what they are talking about, a statement to Connelly that said, "I think you did it." The district attorney in Erie said that, and I don't want the jury to know he thinks that he did it.

JUDGE. Is that what you're talking about?

PROSECUTOR. He asked Connelly—

JUDGE. I said is that what we're talking about?

PROSECUTOR. Yes.

DEFENSE COUNSEL. I object to that, of course.

JUDGE. He asked what he thought of this and Connelly told him. Objection overruled, exception noted.

DEFENSE COUNSEL. Excuse me, are you saying that this witness is now going to be able to testify what an assistant district attorney said?

JUDGE. Yes, because he asked him for it.

DEFENSE COUNSEL. Without a lawyer present, it's hearsay.

PROSECUTOR. He waived it.

DEFENSE COUNSEL. He didn't waive hearsay rules, Judge.

PROSECUTOR. Hearsay rules have nothing to do with it.

JUDGE. Objection overruled, exception noted.

* * * * * *

JUDGE. The only reason I'm allowing it in is, according to the testimony, the defendant specifically asked the district attorney what he thought, and having opened the door, we cannot close it.

380, 387, 416 A.2d 986, 989 (1980). In many of these cases, the prosecutor's improper comments were made during argument; however, in the *Russell* case we reversed and remanded for a new trial when a former assistant district attorney testified that he believed the defendant "had masterminded this crime." In any event, it would be anomalous to hold that the prosecutor's opinion as to the guilt of the accused may be legitimized if it comes in as testimony, and is, thus, evidence, rather than argument. Damage that may be done by an impermissible argument is compounded, not ameliorated, when a prosecutor's opinion as to guilt comes in as testimony, for then the jury must decide not only whether they agree with an argumentative characterization of the accused, but also they must decide the weight of this evidence as compared with other evidence in the case. Thus, a prosecutor's statement of his opinion as to the guilt of the accused, which is improper in the first place, takes on even greater proportions of impropriety when it is offered as evidence.

Judgment of sentence vacated and case remanded for a new trial.

ZAPPALA, J., concurs in the result.

NIX and McDERMOTT file dissenting opinions.

NIX, Justice, dissenting.

I agree with Mr. Justice McDermott's dissent that the assistant district attorney's statement, when evaluated in the context in which it occurred, does not constitute reversible error.

I write separately, however, because I believe that the appellant has raised serious allegations of ineffective assistance of counsel, requiring a remand for a hearing on this issue.

The appellant asserts that he wished to testify in his defense, and insisted on doing so, but was "overruled" by his trial counsel. The right to testify on one's own behalf is a constitutional right, Pa. Const. Art. I, § 9, which is

personal to the accused, *Commonwealth v. Clayton,* 496 Pa. 492, 437 A.2d 1147 (1981). While counsel may "advise" the accused as to whether or not he believes it would be in his best interest to testify, the ultimate decision as to whether to testify is for the accused to make. *Commonwealth v. Good,* 481 Pa. 529, 393 A.2d 30 (1978); *Commonwealth v. Rawles,* 501 Pa. 514, 462 A.2d 619 (1983). *See also Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (concurring opinion by Chief Justice Berger); *United States ex rel. Wilcox v. Johnson,* 555 F.2d 115 (3d Cir.1977). If it is true, as appellant suggests, that his trial counsel prevented him from exercising his constitutional right to testify on his own behalf, then counsel acted beyond the scope of his position and usurped the appellant's basic decision-making role. As such, counsel may well have provided ineffective assistance.

Additionally, I believe that there is arguable merit in appellant's contention that he was denied effective assistance of counsel by counsel's failure to interview and to call certain key witnesses, as well as his failure to present any defense. Believing that the Commonwealth had not met its burden of proof, trial counsel rested without presenting any evidence, notwithstanding the fact that immediately prior thereto, the trial court had denied appellant's motion for a directed verdict of acquittal and his demurrer to the evidence. In light of the significant evidence presented by the prosecution, and mindful of the leeway accorded circumstantial evidence in arson cases, *Commonwealth v. Nasuti,* 385 Pa. 436, 123 A.2d 435 (1956), the risk of resting without presenting any evidence seems especially great in the instant case.

Moreover, if, as the appellant asserts, the witnesses who were available to testify for the defense were not interviewed or called to testify due to a lack of preparation or due dilligence on the part of trial counsel, a grave question as to counsel's competence is also raised.

The appellant contends that Cora Jefferson had testified that she believed the fire was set by her estranged lover,

Peter Moore, who had threatened to "burn the house down" three months prior to the fire. Moore is alleged to have previously demonstrated antagonism toward Mrs. Jefferson, and to have a tendency to resort to violence. Mrs. Jefferson, the mother of Michael Jefferson, lives above the Sweet apartment in the house which burned. Mrs. Jefferson was not interviewed or called by counsel.

The appellant also asserts that Mr. and Mrs. Mello would have testified that they had a clear line of vision to the Sweet/Jefferson house on the night of the fire and as they "sat on their carport", they did not see the appellant exit from the house as he is alleged to have done to obtain the stoddard solvent. They would also testify that after the fire broke out they saw him attempt to enter the building in an effort to save the remaining occupants. Furthermore, Mr. Mello allegedly saw someone fitting Moore's description running from the scene of the fire. The Mellos were not interviewed or called to testify.

Finally, appellant argues that Ann De Santis would testify that on two different occasions Debbie Sweet accused Michael Jefferson of starting the fire and stated that he "should hang". Trial counsel did not interview Ms. DeSantis or Ms. Sweet regarding these accusations, nor did he call them to testify.

Inasmuch as there has been no hearing on appellant's allegations of ineffectiveness of counsel, I would remand for a hearing on that issue.

McDERMOTT, Justice, dissenting.

The majority in this case correctly finds that there was sufficient evidence to support appellant's conviction on one charge of arson and three counts of second degree murder. However, they have seized on a brief exchange which occurred during the trial, branded it prosecutorial misconduct, and vacated the judgment of sentence. With this latter decision I cannot agree.

As set out in the majority opinion, the exchange occurred between the assistant district attorney and a police detective, and went as follows:

Q. Now, Detective DiPaolo, on October the 2nd, 1979, while you were present in this conversation with the defendant and in the presence of Assistant District Attorney Shad Connelly, did the defendant direct a question to Mr. Connelly in your presence?

A. Yes, sir, he did.

Q. What was the question?

A. The defendant asked him at this time, what did he think about this case.

Q. And in your presence and hearing did the Assistant District Attorney Connelly respond?

A. Yes, sir.

. . . . .

Q. What was his response?

A. He said, 'Yes, I think you did it.'

However, in quoting the above language the majority failed to include the next two lines, which read:

Q. What did the defendant respond to Assistant District Attorney Connelly?

A. He told him he was a f\_\_\_g toad just like us.

The prosecutor, contrary to the majority's statement in footnote 2, did indeed assert a rationale for admitting the statement: to show that the appellant's cooperative stance with the police was really a facade to hide his involvement in the crime, and that, when confronted with the fact that the police and district attorney were not accepting his position, his real attitude surfaced.

There is no question that it is improper for a prosecutor to interject his own personal view as to a defendant's guilt. *Commonwealth v. Smith*, 490 Pa. 380, 387, 416 A.2d 986, 989 (1980). But the inquiry does not end there. Such a statement does not inalterably lead to a new trial. "[E]ven when the language is intemperate, uncalled for and improper, a new trial is not necessarily required." *Common-*

*wealth v. Stoltzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975); *Commonwealth v. Johnson*, 496 Pa. 546, 554, 437 A.2d 1175, 1178 (1981); *Commonwealth v. Beavers*, 492 Pa. 522, 527, 424 A.2d 1313, 1316 (1981); *Commonwealth v. Burton*, 491 Pa. 13, 22, 417 A.2d 611, 615 (1980); *Commonwealth v. Crittenton*, 326 Pa. 25, 31, 191 A. 358 (1937).

The standard for ordering a new trial in a case where a prosecutor's statement is improper was recently set out in *Commonwealth v. Upsher*, 497 Pa. 621, 444 A.2d 90 (1982). There, we said that, while a prosecutor's statement might be improper, a new trial is not called for unless it is inevitable that the prosecutor's conduct prejudices the defendant to such a degree that it disables the jury from weighing the evidence and rendering a true verdict. 497 Pa. at 627, 444 A.2d at 93. Furthermore, "The prejudicial effect of the district attorney's remarks must be evaluated in the context in which they occurred." *Commonwealth v. Smith*, 490 Pa. 380, 388, 416 A.2d 986, 989 (1980); *see also, Commonwealth v. Hoskins*, 485 Pa. 542, 555, 403 A.2d 521, 528 (1979); *Commonwealth v. Perkins*, 473 Pa. 116, 134, 373 A.2d 1076, 1085 (1977).

Looking at this brief exchange in the context of the trial as a whole we note that: the statement came in during a four-day trial in which nineteen witnesses testified; the prosecutor did not persist in the challenged line of questioning; and he did not argue the content of the answer in his summation. Such a minor exchange can hardly be said to have robbed the jurors of their role in determining guilt or innocence.

The majority also suggests that the effect of the statement had a greater likelihood of prejudice since it came in as evidence, rather than in oral argument, where this issue typically arises. This reasoning simply ignores the reality of trial procedure and the way this exchange entered this case. Closing argument, along with the jury charge, are the last matters presented to jurors and thus statements contained in a closing argument are more likely to be fresh in the jurors' minds as they walk into the jury room. The

possibility that this brief exchange had a prejudicial effect on the jury is slight. In the context of the entire trial, it is absurd to find that the statement constituted reversible error.

For these reasons, I would affirm the judgment of sentence against the appellant.